# EXHIBIT B

**UNITED STATES DEPARTMENT OF JUSTICE**
**Drug Enforcement Administration**

| | |
|---|---|
| In the Matter of<br><br>Simfarose pharmacy | Docket No. 23-37<br><br>Administrative Law Judge<br><br>Teresa A. Wallbaum |

**GOVERNMENT'S PREHEARING STATEMENT**

Paula M. Trahos
David M. Locher
Attorneys
Drug Enforcement Administration
Office of Chief Counsel
8701 Morrissette Drive
Springfield, Virginia 22152
Email: paula.m.trahos@dea.gov
Office: (571) 776-1548

Dated: May 16, 2023

Pursuant to the Tribunal's May 2, 2023 Order for Prehearing Statements, the United States Department of Justice, Drug Enforcement Administration (DEA or Government), by and through the undersigned counsel, hereby files its Prehearing Statement regarding Simfarose Pharmacy (the Pharmacy).

### ISSUES

Whether the record as a whole establishes by a preponderance of the evidence that the DEA Certificate of Registration (DEA COR) No. FS0588004 issued to the Pharmacy should be revoked, and any pending applications for modification or renewal be denied, because the Pharmacy's continued registration would be inconsistent with the public interest under 21 U.S.C. §§ 823(g)(1) and 824(a)(4).

### REQUESTED RELIEF

The Government requests that the Tribunal recommend that the Pharmacy's DEA COR No. FS0588004 be revoked, and any pending applications for renewal or modification, be denied, on the grounds that the Pharmacy's acts have rendered its continued registration inconsistent with the public interest under 21 U.S.C. §§ 823(g)(1) and 824(a)(4).

### PROPOSED STIPULATIONS OF FACT

Stipulation No. 1:    The Pharmacy is registered with DEA as a retail pharmacy to handle Schedules II through V under DEA registration number FS0588004.

Stipulation No. 2:    The Pharmacy's DEA registered address is 10016 Pines Boulevard, Pembroke Pines, Florida 33024.

Stipulation No. 3:    The Pharmacy's DEA COR expires by its own terms on February 28, 2026.

Stipulation No. 4:    The Pharmacy is registered with the Florida Department of Health as a community pharmacy under license number PH23014.

Stipulation No. 5:    The Pharmacy's State of Florida pharmacy license expires by its own terms on February 28, 2025.

Stipulation No. 6:     Fentanyl is a Schedule II opioid.

Stipulation No. 7:     Hydromorphone is a Schedule II opioid.

Stipulation No. 8:     Oxycodone is a Schedule II opioid.

Stipulation No. 9:     Tramadol is a Schedule IV opioid.

Stipulation No. 10:    Alprazolam is a Schedule IV benzodiazepine.

Stipulation No. 11:    Diazepam is a Schedule IV benzodiazepine.

Stipulation No. 12:    Carisoprodol is a Schedule IV muscle relaxer.

Stipulation No. 13:    Cyclobenzaprine is a non-controlled muscle relaxer.

Stipulation No. 14:    Tizanidine is a non-controlled muscle relaxer.

Stipulation No. 15:    Between November 6, 2019, and October 21, 2022, often on a monthly basis, the Pharmacy filled prescriptions for Patient C.S. for oxycodone 30 mg. During this time period, the Pharmacy frequently also filled concurrent prescriptions for oxycodone/acetaminophen 10/325 mg. These prescriptions provided Patient C.S. with approximately 210 MME/day.

Stipulation No. 16:    Between May 21, 2021, and October 21, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient R.S. These prescriptions provided Patient R.S. with approximately 180 MME/day.

Stipulation No. 17:    Between April 12, 2021, and October 21, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg or oxycodone 20 mg for Patient K.F. During this time period, the Pharmacy frequently also filled prescriptions for 10 to 15 patches of fentanyl. These prescriptions provided Patient K.F. with between approximately 282-630 MME/day.

Stipulation No. 18:    Between April 20, 2021, and October 20, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient J.R. These prescriptions provided Patient J.R. with between approximately 157-180 MME/day.

Stipulation No. 19:    Between May 26, 2021, and October 13, 2022, often on a monthly basis, the Pharmacy filled prescriptions for hydromorphone 8 mg for Patient H.S. These prescriptions provided Patient H.S. between approximately 128-137 MME/day.

Stipulation No. 20:    Between June 19, 2020, and August 25, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient A.W. These prescriptions provided Patient A.W. with approximately 270 MME/day.

Stipulation No. 21:    Between October 29, 2019, and May 31, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg or oxycodone 20 mg for Patient Da.B. These prescriptions provided Patient Da.B. with between approximately 180-270 MME/day.

Stipulation No. 22:    Between September 25, 2020, and February 4, 2022, often on a monthly basis, the Pharmacy filled prescriptions for Patient M.S. for oxycodone 30 mg. During this time period, the Pharmacy frequently also filled concurrent prescriptions for tramadol 50 mg. These prescriptions provided Patient M.S. with between approximately 210-300 MME/day.

Stipulation No. 23:    Between April 14, 2020, and July 14, 2021, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient D.E. Between August 15, 2021, and September 29, 2022, often on a monthly basis, the Pharmacy filled prescriptions for hydromorphone 8 mg for Patient D.E. These prescriptions provided Patient D.E. with between approximately 180-270 MME/day.

Stipulation No. 24:    Between July 9, 2019, and April 8, 2020, and between November 1, 2021, and September 27, 2022, often on a monthly basis, the Pharmacy filled concurrent prescriptions for Patient De.B. for oxycodone 30 mg and oxycodone/acetaminophen 10/325 mg. These prescriptions provided Patient De.B. with approximately 105-225 MME/day.

Stipulation No. 25:    On or about May 12, 2021, through October 14, 2022, the Pharmacy filled prescriptions for Patient M.S. of a drug cocktail consisting of oxycodone and alprazolam.

Stipulation No. 26:    On or about June 7, 2021, through October 12, 2022, the Pharmacy filled prescriptions for Patient Da.B. of a drug cocktail consisting of oxycodone and carisoprodol.

Stipulation No. 27:    On or about June 19, 2020, through August 25, 2022, the Pharmacy filled prescriptions for Patient A.W. of a drug cocktail consisting of oxycodone, carisoprodol, and diazepam.

Stipulation No. 28:    On or about July 23, 2021, through August 17, 2022, the Pharmacy filled prescriptions for Patient H.S. of a drug cocktail consisting of hydromorphone and alprazolam.

Stipulation No. 29:    On or about November 6, 2019, through July 27, 2021, the Pharmacy filled prescriptions for Patient C.S. of a drug cocktail consisting of oxycodone, oxycodone/acetaminophen, and either cyclobenzaprine or tizanidine.

Stipulation No. 30:    On or about September 19, 2019, through February 9, 2021, the Pharmacy filled prescriptions for Patient K.F. of a drug cocktail consisting of oxycodone and alprazolam.

Stipulation No. 31:    On or about May 30, 2017, through May 14, 2018, the Pharmacy filled prescriptions for Patient D.E. of a drug cocktail consisting of oxycodone, alprazolam, and the muscle relaxer tizanidine.

Stipulation No. 32:    Patient M.S. paid in cash for oxycodone. Patient M.S. paid prices from $880.00 for 110 tablets to $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about January 14, 2016, to at least December 14, 2021.

Stipulation No. 33:    Patient C.S. paid in cash for oxycodone. Patient C.S. paid $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about January 18, 2016, to at least December 7, 2021.

Stipulation No. 34:    Patient A.W. paid in cash for oxycodone. Patient A.W. paid prices from $360.00 for 60 tablets to $480.00 for 60 tablets ($6.00 to $8.00 per pill) of oxycodone starting on or about September 23, 2016, to at least December 1, 2021.

Stipulation No. 35:    Patient De.B. paid in cash for oxycodone. Patient De.B. paid $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about January 12, 2016, to at least November 30, 2021.

Stipulation No. 36:    Patient H.S. paid in cash for hydromorphone. Patient H.S. paid $960.00 for 120 tablets ($8.00 per pill) of hydromorphone 8 mg starting on or about December 21, 2016, to at least December 7, 2021.

Stipulation No. 37:    Patient R.S. paid in cash for oxycodone. Patient R.S. paid $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about June 16, 2016, to at least July 18, 2018.

Stipulation No. 38:    Patient D.E. paid in cash for oxycodone. Patient D.E. paid $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about October 12, 2016, to at least January 15, 2019.

Stipulation No. 39:   Patient D.E.'s address is in Fort Lauderdale, FL. Patient D.E.'s doctor's office is located in Pompano Beach, FL, 15 miles north from D.E.'s home. D.E. traveled 26 miles southeast to the Pharmacy in Pembroke Pines, FL. Finally, D.E. traveled 11 miles northeast back home. Therefore, D.E. traveled a total of approximately 52 miles, and approximately one hour and 20 minutes each trip.

Stipulation No. 40:   Patient H.S.'s address is in Plantation, FL. Patient H.S.'s doctor's office is located in North Miami Beach, FL, 20 miles south from H.S.'s home. H.S. traveled 12 miles northwest to the Pharmacy in Pembroke Pines, FL. Finally, H.S. traveled 14 miles north back home. Therefore, H.S. traveled a total of approximately 46 miles and approximately one hour and 25 minutes each trip.

Stipulation No. 41:   Patient M.S.'s address is in Miami, FL. Patient M.S.'s doctor's office is located in Miami, FL, 18 miles south from M.S.'s home. M.S. traveled 25 miles northwest past M.S.'s residence to the Pharmacy in Pembroke Pines, FL. Finally, M.S traveled six miles south back home. Therefore, M.S. traveled a total of approximately 49 miles and approximately one hour and 25 minutes each trip.

Stipulation No. 42:   Patient K.F.'s address is in Fort Lauderdale, FL. Patient K.F.'s doctor's office is located in Miami, FL, 39 miles south from K.F.'s home. K.F. traveled 29 miles north to the Pharmacy in Pembroke Pines, FL. Finally, K.F. traveled 8 miles northeast back home. Therefore, K.F. traveled a total of approximately 76 miles and approximately one hour and 50 minutes each trip.

## PROPOSED WITNESSES[1]

1. Melissa Szwanke, Diversion Investigator, DEA Miami Field Division, 2100 N Commerce Parkway, Weston, FL 33326.

2. Michael Marra, Forensic IT Specialist, 8550 Cinder Bed Road, Suite 500, Lorton, VA 22079.

3. Thomas Helfin, Forensic IT Specialist, 8550 Cinder Bed Road, Suite 500, Lorton, VA 22079.

4. Luke Repasky, Forensic IT Specialist, 8550 Cinder Bed Road, Suite 500, Lorton, VA 22079.

5. Dr. Thomas E. Hamilton, Pharm.D., 1901 SW 67th Terrace, Plantation, Florida 33317.

---

[1] The Government reserves the right to call rebuttal witnesses as well as any of the witnesses listed by Respondent.

## SUMMARY OF TESTIMONY

1. <u>Diversion Investigator (DI) Melissa Szwanke</u>

DI Szwanke will testify about her background, training, and experience as a DI with DEA. She will testify she was assigned to the Miami Field Office of DEA during the course of DEA's investigation of the Pharmacy. She will testify that she is the lead DI assigned to DEA's investigation of the Pharmacy. DI Szwanke will identify and authenticate the Pharmacy's DEA COR. DI Szwanke will testify that in 2020, DEA began an investigation into the Pharmacy because (1) DEA had taken action against practitioners whose patients filled prescriptions at the Pharmacy; (2) DEA learned of investigations into the Pharmacy from other sources; and (3) DEA received information from the Pharmacy's distributor regarding suspicious orders for controlled substances the Pharmacy had placed.

DI Szwanke will testify that in the course of her regular duties, and as part of this investigation, she obtained and analyzed the Pharmacy's Florida Prescription Drug Monitoring Program (PDMP) data. DI Szwanke will identify and authenticate a copy of the Pharmacy's PDMP data.

DI Szwanke will testify that on March 26, 2021, the United States Department of Health and Human Services Office of Inspector General (HHS/OIG) served a Civil Investigative Demand (CID) upon the Pharmacy.

DI Szwanke will testify that on December 17, 2021, DEA executed an Administrative Inspection Warrant (AIW) at the Pharmacy seeking, in part, certain patient profiles and copies of controlled substance prescriptions dispensed by the Pharmacy. During the execution of the AIW, DEA seized a security camera DVR, computer server, one desktop computer, two external hard drives, and original pharmacy records to include original prescriptions. DI Szwanke will identify

and authenticate prescriptions and patient profiles, to include medical expense reports, patient charts, patient notes, and RX profiles retrieved from the AIW.

DI Szwanke will testify that Forensic Technicians Thomas Helfin, Michael Marra and Luke Repasky were able to download and compile items seized during the AIW.

DI Szwanke will testify that on or about June 3, 2022, she contacted the Pharmacy to advise that the electronics were available to be returned. Nonetheless, neither the Pharmacy nor their counsel arranged to retrieve the items.

DI Szwanke will testify that based on the physical evidence obtained from the Pharmacy and the opinion of Dr. Hamilton, she sought the issuance of an Order to Show Cause and Immediate Suspension Order.

2. <u>Forensic Technician Michael Marra</u>

After testifying about his education and experience, Mr. Marra will testify about the data recovery at the Pharmacy. Mr. Marra will testify that he assisted with data recovery. He will testify that the Pharmacy uses QS1 software. Mr. Marra will testify that with the assistance of technical support at QS1, he recovered patient profiles, to include medical expense reports, patient charts, patient notes, and RX profiles retrieved from the AIW. Mr. Marra will testify that he saved the patient profiles, to include medical expense reports, patient charts, patient notes, and RX profiles on an external hard drive that was given to DI Szwanke.

3. <u>Forensic Technician Thomas Helfin</u>

To the extent necessary, Mr. Helfin will testify about the same matters as Mr. Marra.

4. <u>Forensic Technician Luke Repasky</u>

To the extent necessary, Mr. Repasky will testify about the same matters as Mr. Marra.

5. <u>Dr. Thomas E. Hamilton, Pharm. D.</u>

Dr. Hamilton will testify as an expert in pharmacy practice in the State of Florida, including, but not limited to, the filling of controlled substances in the usual course of professional practice in the State of Florida. He will testify regarding his background and experience. He will identify and authenticate a copy of his curriculum vitae.

Dr. Hamilton will testify regarding the standard of care for a Florida pharmacy. He will testify regarding Florida and Federal laws and regulations that have informed his opinions regarding that standard of care, including Fla. Admin. Code Ann. r. 64B16-27.800, 64B16-27.810, and 64B16-27.831; and 21 C.F.R. §§ 1306.04(a) and 1306.06.

Dr. Hamilton will also testify that a pharmacist may only fill a prescription for a controlled substance "in the usual course of his professional practice." Additionally, Dr. Hamilton will testify regarding a pharmacist's "corresponding responsibility" to ensure that a prescription for a controlled substance is legitimate prior to filling it, pursuant to 21 C.F.R. § 1306.04(a). He will testify that a pharmacist has an affirmative obligation to identify and resolve various indicia of suspiciousness (*i.e.*, "red flags") prior to dispensing controlled substances. Dr. Hamilton will testify about red flags in pharmacy practice, including what they indicate and how they should be handled to conform to the standards of pharmacists' professional practice in the State of Florida. Dr. Hamilton will testify red flags indicate or create reasonable suspicion that a controlled substance prescription may be invalid or illegitimate. Dr. Hamilton will also testify some examples of red flags include: (1) patients being prescribed long-term use of immediate release opioids often in high dosages, (2) patients being prescribed drug cocktails, (3) patients paying cash and high prices for controlled substance prescriptions, and (4) patients traveling long distances to obtain/fill prescriptions.

Dr. Hamilton will testify that if a Florida pharmacist identifies a controlled substance prescription with one or multiple red flags the pharmacist is obligated to address and resolve the red flags, and to make a record of the resolution. If the pharmacist cannot resolve all red flags, the Pharmacy may not fill the controlled substance prescription.

**<u>Immediate Release, Therapeutic Duplication and High Dosage Opioids</u>**

Dr. Hamilton will testify that oxycodone, (including oxycodone-acetaminophen), hydromorphone, fentanyl, and tramadol are all commonly abused opioid medications. He will testify that the oxycodone, hydromorphone, and tramadol prescriptions filled by the Pharmacy and at issue in this case are also immediate-release or short-acting opioids. Dr. Hamilton will testify that excessive usage of immediate-release/short-acting opioids is a red flag. He will testify that immediate release opioids should be used on an as-needed basis. Dr. Hamilton will testify that taking opioids for long periods of time can increase the likelihood of dependency, and can be harmful to vital organs. He will testify that because short-acting opioids are to be taken as needed, they generally should not be prescribed on a schedule.

Dr. Hamilton will discuss the Morphine Milligram Equivalent (MME), which is a scale that compares and quantifies the potency of various opioids. He will testify that high MME prescriptions are a red flag. Dr. Hamilton will testify that the Pharmacy regularly dispensed controlled substances at high dosages. Dr. Hamilton will testify that the Pharmacy failed to document the red flag of high MME and failed to appropriately resolve the red flag. Dr. Hamilton will testify to the following:

<u>Patient C.S.:</u> Between November 6, 2019, and October 21, 2022, often on a monthly basis, the Pharmacy filled prescriptions for Patient C.S. for oxycodone 30 mg. During this time period, the Pharmacy frequently also filled concurrent prescriptions for

oxycodone/acetaminophen 10/325 mg. These prescriptions provided Patient C.S. with approximately 210 MME/day. Dr. Hamilton will testify that 210 MME/day is a high MME. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient R.S.: Between May 21, 2021, and October 21, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient R.S. These prescriptions provided Patient R.S. with approximately 180 MME/day. Dr. Hamilton will testify that 180 MME/day is a high MME. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient K.F.: Between April 12, 2021, and October 21, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg or oxycodone 20 mg for Patient K.F. During this time period, the Pharmacy frequently also filled prescriptions for 10 to 15 patches of fentanyl. These prescriptions provided Patient K.F. with between approximately 282-630 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient J.R.: Between April 20, 2021, and October 20, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient J.R. These prescriptions provided Patient J.R. with between approximately 157-180 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the

11

Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient H.S.: Between May 26, 2021, and October 13, 2022, often on a monthly basis, the Pharmacy filled prescriptions for hydromorphone 8 mg for Patient H.S. These prescriptions provided Patient H.S. between approximately 128-137 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient A.W.: Between June 19, 2020, and August 25, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient A.W. These prescriptions provided Patient A.W. with approximately 270 MME/day. Dr. Hamilton will testify that 270 MME/day is a high MME. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient Da.B.: Between October 29, 2019, and May 31, 2022, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg or oxycodone 20 mg for Patient Da.B. These prescriptions provided Patient Da.B. with between approximately 180-270 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient M.S.: Between September 25, 2020, and February 4, 2022, often on a monthly basis, the Pharmacy filled prescriptions for Patient M.S. for oxycodone 30 mg. During this time period, the Pharmacy frequently also filled concurrent prescriptions for

tramadol 50 mg. These prescriptions provided Patient M.S. with between approximately 210-300 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient D.E.: Between April 14, 2020, and July 14, 2021, often on a monthly basis, the Pharmacy filled prescriptions for oxycodone 30 mg for Patient D.E. Between August 15, 2021, and September 29, 2022, often on a monthly basis, the Pharmacy filled prescriptions for hydromorphone 8 mg for Patient D.E. These prescriptions provided Patient D.E. with between approximately 180-270 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

Patient De.B.: Between July 9, 2019, and April 8, 2020, and between November 1, 2021, and September 27, 2022, often on a monthly basis, the Pharmacy filled concurrent prescriptions for Patient De.B. for oxycodone 30 mg and oxycodone/acetaminophen 10/325 mg. These prescriptions provided Patient De.B. with approximately 105-225 MME/day. Dr. Hamilton will testify that these are high MMEs. Dr. Hamilton will testify that the Pharmacy failed to appropriately document the red flag of high MMEs and failed to properly resolve this red flag and document efforts to do so.

### **Drug Cocktails**

Dr. Hamilton will testify that a common red flag of a possible illegitimate prescription appears when a physician prescribes drugs in certain combinations that are known to be abused,

diverted, or can increase a patient's risk of death or overdose (*i.e.*, drug "cocktails"). Dr. Hamilton will testify that "cocktail" prescribing is consistent with diversion and abuse. Dr. Hamilton will testify that cocktail prescribing raises a red flag that must be addressed, resolved, and documented prior to dispensing the controlled substances. Dr. Hamilton will testify that the Pharmacy repeatedly filled multiple prescriptions for drug cocktails for patients without appropriately resolving this red flag. He will testify that in several instances the Pharmacy filled prescriptions for opioids (*e.g.*, oxycodone, oxycodone-acetaminophen, and/or hydromorphone) together with benzodiazepines (*e.g.*, alprazolam and diazepam) and/or muscle relaxers (*e.g.*, carisoprodol, cyclobenzaprine, and tizanidine). Dr. Hamilton will testify that taking opioids and benzodiazepines or muscle relaxers together increases a patient's risk of respiratory depression, overdose and death. He will testify that the combination of substances can cause depressive episodes of breathing, heart function, and mental state. Dr. Hamilton will testify to the following:

> Patient M.S.: On or about May 12, 2021, through October 14, 2022, the Pharmacy repeatedly filled prescriptions for Patient M.S. of a drug cocktail consisting of oxycodone and alprazolam. Dr. Hamilton will testify that the Pharmacy dispensed this drug cocktail despite its risk of diversion, abuse, and death. He will testify that the Pharmacy did not properly identify, document, or resolve this red flag.

> Patient Da.B.: On or about June 7, 2021, through October 12, 2022, the Pharmacy repeatedly filled prescriptions for Patient Da.B. of a drug cocktail consisting of oxycodone and carisoprodol. Dr. Hamilton will testify that the Pharmacy dispensed this drug cocktail despite its risk of diversion, abuse, and death. He will testify that the Pharmacy did not properly identify, document, or resolve this red flag.

Patient A.W.: On or about June 19, 2020, through August 25, 2022, the Pharmacy repeatedly filled prescriptions for Patient A.W. of a drug cocktail consisting of oxycodone, carisoprodol, and diazepam. Dr. Hamilton will testify that the Pharmacy dispensed this drug cocktail despite its risk of diversion, abuse, and death. He will testify that the Pharmacy did not properly identify, document, or resolve this red flag.

Patient H.S.: On or about July 23, 2021, through August 17, 2022, the Pharmacy repeatedly filled prescriptions for Patient H.S. of a drug cocktail consisting of hydromorphone and alprazolam. Dr. Hamilton will testify that the Pharmacy dispensed this drug cocktail despite its risk of diversion, abuse, and death. He will testify that the Pharmacy did not properly identify, document, or resolve this red flag.

Patient C.S.: On or about November 6, 2019, through July 27, 2021, the Pharmacy repeatedly filled prescriptions for Patient C.S. of a drug cocktail consisting of oxycodone, oxycodone/acetaminophen, and either cyclobenzaprine or tizanidine. Dr. Hamilton will testify that the Pharmacy dispensed this drug cocktail despite its risk of diversion, abuse, and death. He will testify that the Pharmacy did not properly identify, document, or resolve this red flag.

Patient K.F.: On or about September 19, 2019, through February 9, 2021, the Pharmacy repeatedly filled prescriptions for Patient K.F. of a drug cocktail consisting of oxycodone and alprazolam. Dr. Hamilton will testify that the Pharmacy dispensed this drug cocktail despite its risk of diversion, abuse, and death. He will testify that the Pharmacy did not properly identify, document, or resolve this red flag.

Patient D.E.: On or about May 30, 2017, through May 14, 2018, the Pharmacy repeatedly filled prescriptions for Patient D.E. of a drug cocktail consisting of oxycodone,

15

alprazolam, and the muscle relaxer tizanidine. Dr. Hamilton will testify that the

Pharmacy this drug cocktail despite its risk of diversion, abuse, and death. He will testify

that the Pharmacy did not properly identify, document, or resolve this red flag.

### Cash Payments and High Prices

Dr. Hamilton will testify that cash payments for controlled substance prescriptions raise a

"red flag" that must be addressed, resolved, and documented prior to dispensing the controlled

substance. Dr. Hamilton will testify that when a patient pays for controlled substance

prescriptions with cash, it permits a patient to avoid scrutiny associated with the use of insurance

as part of the payment process. Dr. Hamilton will testify insurance companies will often decline

to pay for suspicious controlled substance prescriptions that may be related to drug abuse and

diversion.

Dr. Hamilton will also testify that this red flag is particularly egregious if the patient pays

prices significantly above market price. Dr. Hamilton will testify that a legitimate patient would

not pay high prices for controlled substances when the same substance can be purchased for a

fraction of the price. Dr. Hamilton will testify that the Pharmacy did not adequately resolve this

red flag. Dr. Hamilton will testify to the following:

> Patient M.S.: Paid, in cash, prices from $880.00 for 110 tablets to $960.00 for 120
>
> tablets ($8.00 per pill) of oxycodone starting on or about January 14, 2016, to at least
>
> December 14, 2021, which is well above the market price.
>
> Patient C.S.: Paid, in cash, $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting
>
> on or about January 18, 2016, to at least December 7, 2021, which is well above the
>
> market price.

Patient A.W.: Paid, in cash, from $360.00 for 60 tablets to $480.00 for 60 tablets ($6.00 to $8.00 per pill) of oxycodone starting on or about September 23, 2016, to at least December 1, 2021, which is well above the market price.

Patient De.B.: Paid, in cash, $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about January 12, 2016, to at least November 30, 2021, which is well above the market price.

Patient H.S.: Paid, in cash, $960.00 for 120 tablets ($8.00 per pill) of hydromorphone 8 mg starting on or about December 21, 2016, to at least December 7, 2021, which is well above the market price.

Patient R.S.: Paid, in cash, $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about June 16, 2016, to at least July 18, 2018, which is well above the market price.

Patient D.E.: Paid, in cash, $960.00 for 120 tablets ($8.00 per pill) of oxycodone starting on or about October 12, 2016, to at least January 15, 2019, which is well above the market price.

**Long Distances**

Dr. Hamilton will testify traveling long distances to obtain or fill controlled substance prescriptions raises a "red flag" that must be addressed, resolved, and documented prior to dispensing the controlled substance. Dr. Hamilton will testify a patient traveling a long distance from their home to a practitioner and/or subsequently traveling a long distance to fill a controlled substance prescription is suspicious and an indication of misuse. Dr. Hamilton will testify that the Pharmacy did not properly document and resolve this red flag. Dr. Hamilton will testify to the following:

Patient D.E.: Patient D.E.'s address is in Fort Lauderdale, FL. Patient D.E.'s doctor's office is located in Pompano Beach, FL, 15 miles north from D.E.'s home. D.E. traveled 26 miles southeast to the Pharmacy in Pembroke Pines, FL. Finally, D.E. traveled 11 miles northeast back home. Therefore, D.E. traveled a total of approximately 52 miles, and approximately one hour and 20 minutes each trip. Dr. Hamilton will testify that the Pharmacy repeatedly filled D.E.'s above-mentioned prescriptions without properly resolving the red flag of traveling long distances.

Patient H.S.: Patient H.S.'s address is in Plantation, FL. Patient H.S.'s doctor's office is located in North Miami Beach, FL, 20 miles south from H.S.'s home. H.S. traveled 12 miles northwest to the Pharmacy in Pembroke Pines, FL. Finally, H.S. traveled 14 miles north back home. Therefore, H.S. traveled a total of approximately 46 miles and approximately one hour and 25 minutes each trip. Dr. Hamilton will testify that the Pharmacy repeatedly filled H.S.'s above-mentioned prescriptions without properly resolving the red flag of traveling long distances.

Patient M.S.: Patient M.S.'s address is in Miami, FL. Patient M.S.'s doctor's office is located in Miami, FL, 18 miles south from M.S.'s home. M.S. traveled 25 miles northwest past M.S.'s residence to the Pharmacy in Pembroke Pines, FL. Finally, M.S traveled six miles south back home. Therefore, M.S. traveled a total of approximately 49 miles and approximately one hour and 25 minutes each trip. Dr. Hamilton will testify that the Pharmacy repeatedly filled M.S.'s above-mentioned prescriptions without properly resolving the red flag of traveling long distances.

Patient K.F.: Patient K.F.'s address is in Fort Lauderdale, FL. Patient K.F.'s doctor's office is located in Miami, FL, 39 miles south from K.F.'s home. K.F. traveled 29 miles

north to the Pharmacy in Pembroke Pines, FL. Finally, K.F. traveled 8 miles northeast back home. Therefore, K.F. traveled a total of approximately 76 miles and approximately one hour and 50 minutes each trip. Dr. Hamilton will testify that the Pharmacy repeatedly filled K.F.'s above-mentioned prescriptions without properly resolving the red flag of traveling long distances.

### Red Flag Resolution

Dr. Hamilton will testify that prior to dispensing, red flags need to be resolved. He will testify that, oftentimes, red flags can be resolved by speaking with the doctor. Further, he will testify that the resolution must be documented and that the documentation can be in patient notes, prescription notes, transaction notes or on the face of the prescription.

Dr. Hamilton will testify that where some red flags can be resolved, there are unresolvable red flags which should result in refusal to fill the prescription. He will identify the Pharmacy frequently filling immediate-release opioid prescriptions for its patients on a regular basis over a significant period of time – often at the highest strength available and/or in a therapeutically duplicative combination with other immediate-release opioids as an un-resolvable red flag. Dr. Hamilton will also identify the Pharmacy filling controlled substance prescriptions for cash as un-resolvable after the second fill.

Dr. Hamilton will testify that with respect to the prescriptions described above, the pharmacists at the Pharmacy knew or had reason to know that the prescriptions were not written for a legitimate medical purpose. He will testify that when the Pharmacy filled the prescriptions, it did so by failing to abide by the standards of their professional practice. Dr. Hamilton will testify that the Pharmacy failed to identify red flags and consequently also failed to resolve and document the resolution of the red flags present.

## GOVERNMENT PROPOSED EXHIBITS

| | |
|---|---|
| Gvt. Proposed Ex. No. 1 | DEA Certificate of Registration No. FS0588004 (2 pages) |
| Gvt. Proposed Ex. No. 2 | Florida Department of Health License No. PH23014 Verification Printout (1 page) |
| Gvt. Proposed Ex. No. 3 | The Pharmacy's PDMP Report from July 2017 – October 2022 (1 Excel File) |
| Gvt. Proposed Ex. No. 4 | Curriculum Vitae for Dr. Thomas E. Hamilton, PharmD (4 pages) |
| Gvt. Proposed Ex. No. 5 | Administrative Inspection Warrant, dated December 13, 2021 (17 pages) |
| Gvt. Proposed Ex. No. 6 | Prescriptions filled for Patient C.S. (104 pages) |
| Gvt. Proposed Ex. No. 7 | Prescriptions filled for Patient Da.B. (107 pages) |
| Gvt. Proposed Ex. No. 8 | Prescriptions filled for Patient D.E. (111 pages) |
| Gvt. Proposed Ex. No. 9 | Prescriptions filled for Patient De.B. (40 pages) |
| Gvt. Proposed Ex. No. 10 | Prescriptions filled for Patient H.S. (100 pages) |
| Gvt. Proposed Ex. No. 11 | Prescriptions filled for Patient J.R. (50 pages) |
| Gvt. Proposed Ex. No. 12 | Prescriptions filled for Patient R.S. (52 pages) |
| Gvt. Proposed Ex. No. 13 | Prescriptions filled for Patient M.S. (81 pages) |
| Gvt. Proposed Ex. No. 14 | Prescriptions filled for Patient K.F. (195 pages) |
| Gvt. Proposed Ex. No. 15 | Prescriptions filled for Patient A.W. (116 pages) |
| Gvt. Proposed Ex. No. 16 | Medical Expense Report for Patient C.S. (21 pages) |
| Gvt. Proposed Ex. No. 17 | Medical Expense Report for Patient Da.B. (109 pages) |
| Gvt. Proposed Ex. No. 18 | Medical Expense Report for Patient D.E. (119 pages) |
| Gvt. Proposed Ex. No. 19 | Medical Expense Report for Patient De.B. (44 pages) |
| Gvt. Proposed Ex. No. 20 | Medical Expense Report for Patient H.S. (38 pages) |
| Gvt. Proposed Ex. No. 21 | Medical Expense Report for Patient J.R. (68 pages) |
| Gvt. Proposed Ex. No. 22 | Medical Expense Report for Patient R.S. (28 pages) |

Gvt. Proposed Ex. No. 23             Medical Expense Report for Patient M.S. (12 pages)

Gvt. Proposed Ex. No. 24             Medical Expense Report for Patient K.F. (79 pages)

Gvt. Proposed Ex. No. 25             Medical Expense Report for Patient A.W. (56 pages)

Gvt. Proposed Ex. No. 26             Patient Chart for Patient C.S. (12 pages)

Gvt. Proposed Ex. No. 27             Patient Chart for Patient Da.B. (12 pages)

Gvt. Proposed Ex. No. 28             Patient Chart for Patient D.E. (15 pages)

Gvt. Proposed Ex. No. 29             Patient Chart for Patient De.B. (10 pages)

Gvt. Proposed Ex. No. 30             Patient Chart for Patient H.S. (11 pages)

Gvt. Proposed Ex. No. 31             Patient Chart for Patient J.R. (17 pages)

Gvt. Proposed Ex. No. 32             Patient Chart for Patient R.S. (13 pages)

Gvt. Proposed Ex. No. 33             Patient Chart for Patient M.S. (4 pages)

Gvt. Proposed Ex. No. 34             Patient Chart for Patient K.F. (15 pages)

Gvt. Proposed Ex. No. 35             Patient Chart for Patient A.W. (15 pages)

Gvt. Proposed Ex. No. 36             Patient Notes for Patient C.S. (1 page)

Gvt. Proposed Ex. No. 37             Patient Notes for Patient Da.B. (1 page)

Gvt. Proposed Ex. No. 38             Patient Notes for Patient D.E. (1 page)

Gvt. Proposed Ex. No. 39             Patient Notes for Patient De.B. (1 page)

Gvt. Proposed Ex. No. 40             Patient Notes for Patient H.S. (1 page)

Gvt. Proposed Ex. No. 41             Patient Notes for Patient J.R. (1 page)

Gvt. Proposed Ex. No. 42             Patient Notes for Patient R.S. (1 page)

Gvt. Proposed Ex. No. 43             Patient Notes for Patient M.S. (1 page)

Gvt. Proposed Ex. No. 44             Patient Notes for Patient K.F. (1 page)

Gvt. Proposed Ex. No. 45             Patient Notes for Patient A.W. (1 page)

Gvt. Proposed Ex. No. 46             RX Profile for Patient C.S. (19 pages)

Gvt. Proposed Ex. No. 47             RX Profile for Patient Da.B. (1 page)

Gvt. Proposed Ex. No. 48            RX Profile for Patient D.E. (38 pages)

Gvt. Proposed Ex. No. 49            RX Profile for Patient De.B. (16 pages)

Gvt. Proposed Ex. No. 50            RX Profile for Patient H.S. (32 pages)

Gvt. Proposed Ex. No. 51            RX Profile for Patient J.R. (37 pages)

Gvt. Proposed Ex. No. 52            RX Profile for Patient R.S. (15 pages)

Gvt. Proposed Ex. No. 53            RX Profile for Patient M.S. (14 pages)

Gvt. Proposed Ex. No. 54            RX Profile for Patient K.F. (42 pages)

Gvt. Proposed Ex. No. 55            RX Profile for Patient A.W. (44 pages)

## POSITION REGARDING HEARING SITUS

The Government requests to hold the hearing at the location established in the Order to Show Cause, the DEA Hearing Facility in Arlington, Virginia.

The Government requests the Tribunal allow Government witnesses to have the option to testify remotely, via video teleconference (VTC), if necessary.

## ESTIMATE OF TIME

The Government estimates that it can present its case-in-chief in two days, exclusive of cross-examination.

## OTHER MATTERS

The Government reserves the opportunity to amend its Prehearing Statement at a time and date specified by this Tribunal.

The Government also requests that all notices in this matter be sent to Government counsel at paula.m.trahos@dea.gov and david.m.locher@dea.gov, in addition to dea.registration.litigation@dea.gov.

Dated: May 16, 2023

Respectfully submitted,

/s/ Paula M. Trahos
Paula M. Trahos
David M. Locher
Attorneys
Drug Enforcement Administration
Office of Chief Counsel
8701 Morrissette Drive
Springfield, Virginia 22152
Email: paula.m.trahos@dea.gov
Office: (571) 776-1548

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2023, I caused the foregoing to be filed with the DEA
Office of Administrative Law Judges by electronic mail at ECF-DEA@usdoj.gov, and I caused a
copy of the same to be sent by electronic mail to Respondent at jtartaglia@jatlawoffice.com and
vito@penzalawfirm.com.


/s/ Paula M. Trahos
Paula M. Trahos