UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-CV-61531-LEIBOWITZ/VALLE

SIMFA ROSE PHARMACEUTICAL
SPECIALTY, INC.,

      Plaintiff,

v.

PAMELA J. BONDI,[1] *et al.*,

      Defendants.

_____

### **REPORT AND RECOMMENDATION TO DISTRICT JUDGE**

THIS MATTER is before the Court upon: (i) Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 55) (the "Motion to Dismiss"); and (ii) Plaintiff's Cross-Motion for Summary Judgment (ECF No. 62) (the "Cross-Motion for Summary Judgment") (together, the "Motions").  U.S. District Judge David S. Leibowitz has referred the Motions to the undersigned for a Report and Recommendation.  (ECF No. 69).

Having reviewed Defendants' Motion to Dismiss and accompanying Memorandum of Law (ECF No. 56), Plaintiff's Response (ECF No. 59), Plaintiff's Cross-Motion for Summary Judgment, Defendants' Omnibus Response (ECF No. 66), and Plaintiff's Reply (ECF No. 68), and being fully advised in the matter, the undersigned recommends that the Motion to Dismiss be **GRANTED**, and the Cross-Motion for Summary Judgment be **DENIED** for the reasons set forth below.

_____

[1] Pursuant to Fed. R. Civ. P. 25(d), Pamela J. Bondi is substituted for Merrick B. Garland as Attorney General of the United States.

## I.     BACKGROUND

### A.     Order to Show Cause and Immediate Suspension of Simfa's DEA Registration

Plaintiff Simfa Rose Pharmaceutical Specialty, Inc. ("Simfa") is a specialty pharmacy in Pembroke Pines, Florida, registered with the Drug Enforcement Administration ("DEA") to dispense controlled substances.  (ECF No. 50 at 5).  Beginning in November 2007, DEA had repeatedly renewed Simfa's registration.  *Id.*  In December 2021, in connection with an ongoing administrative investigation, DEA executed an Administrative Inspection Warrant on Simfa's premises, seizing patient profiles and copies of prescriptions for controlled substances (opioids and other drugs listed on Schedules II through V) dispensed by Simfa.  *See* (ECF Nos. 56 at 5, 56-2 at 2-4).

Nonetheless, despite the ongoing administrative investigation, on January 6, 2023, DEA again renewed Simfa's registration and issued Certificate of Registration No. FS0588004 (the "COR") that is central to this dispute.  (ECF Nos. 50-1, 63 at 1).  Thus, Simfa continued to purchase and dispense controlled substances listed on Schedules II through V.  (ECF No. 63 at 1).  On April 10, 2023, however, DEA issued an Order to Show Cause and Immediate Suspension of Registration (the "OSC/ISO"), which suspended and sought to permanently revoke Simfa's COR. *Id.* at 2; *see* (ECF No. 50-2).  The OSC/ISO described Simfa's actions, which DEA considered to be "red flags" for diversion and/or abuse of controlled substances, including: (i) dispensing immediate-release opioids containing high morphine milligram equivalents on a regular basis over a significant period of time; (ii) dispensing dangerous combinations of controlled substances (i.e., "drug cocktails"); (iii) charging higher prices for controlled substances as compared to other local pharmacies and accepting cash payments; and (iv) dispensing controlled substances to patients who traveled unusually long distances to obtain their prescriptions.  (ECF No. 50-2 at 5-9).  Based

on these "red flags," the OSC/ISO concluded that Simfa's continued registration posed "an imminent danger to the public health or safety" and was "inconsistent with the public interest." *Id*. at 2; *see* 21 U.S.C §§ 823(g)(1), 824(d). DEA therefore seized Simfa's inventory of controlled substances, which Simfa estimates is valued at approximately $75,000. (ECF Nos. 50-3, 63 at 2, 67 at 2).

In compliance with DEA's administrative procedures, Simfa timely requested a hearing before a DEA Administrative Law Judge (the "ALJ") and then participated in the preliminary stages of the administrative proceeding. *See* (ECF Nos. 56 at 2, 6, 56-1 at 2). Prior to a merits hearing, however, the ALJ granted Simfa's request to stay the administrative proceeding pending the outcome of this federal case. *See* (ECF Nos. 56 at 2, 6, 56-3 at 2-4, 56-4 at 2-10).

### B.     Procedural History in Federal Court

On August 9, 2023, the same day the ALJ stayed the DEA administrative proceeding, Simfa filed this action against the Attorney General of the United States (the "AG"), Administrator of the DEA, DEA, and United States (collectively, "Defendants"), seeking declaratory and injunctive relief challenging DEA's purportedly unconstitutional administrative structure. *See generally* (ECF No. 1). In March 2024, Defendants filed their first motion to dismiss Simfa's initial complaint. *See generally* (ECF Nos. 19, 20). In response, Simfa filed its First Amended Complaint, mooting Defendants' motion to dismiss. *See* (ECF Nos. 24, 30).

Simfa's First Amended Complaint contained ten counts, alleging that DEA's administrative structure was unconstitutional on several grounds. *See generally* (ECF No. 24). In August 2024, the District Judge dismissed the First Amended Complaint without prejudice as an

impermissible shotgun pleading and gave Simfa a final opportunity to amend its complaint to cure the pleading deficiencies.[2]  (ECF No. 43 at 3).

In October 2024, Simfa filed its Second Amended Complaint (the "SAC"), which remains the operative pleading.  *See generally* (ECF No. 50).  The SAC alleges that Defendants: (i) violated Simfa's Seventh Amendment right to trial by jury (Count 1); (ii) deprived Simfa of private property outside of an Article III court (and without a jury) (Count 2); (iii) violated Simfa's due process rights (Count 3); (iv) violated separation of powers principles in Article II through the dual-layer for-cause removal protection afforded to the DEA ALJ (Count 4); and (v) violated the nondelegation doctrine by giving DEA unfettered discretion to select where to bring its enforcement actions and engaging in new rulemaking (Count 5).  *See id*.

### C.    The Motion to Dismiss and Response

In November 2024, Defendants filed the instant Motion to Dismiss the SAC.  *See generally* (ECF Nos. 55, 56).   In the Motion to Dismiss, Defendants argue that Simfa's: (i) Seventh Amendment and Article III claims in Counts 1 and 2 fail because neither are implicated in DEA's administrative proceeding, which seeks injunctive relief, and, in any event, involves the adjudication of public rights; (ii) Due Process challenges in Count 3 are either foreclosed by Supreme Court precedent (as to Simfa's structural challenge to DEA's administrative structure) or must be administratively exhausted before federal court review (as to Simfa's as-applied challenge); (iii) Article II challenge to DEA's ALJ removal protections in Count 4 does not allege harm with the requisite specificity;[3] and (iv) nondelegation argument in Count 5 fails because DEA

---

[2] Initially, the ALJ lifted the stay of the administrative proceeding upon this Court's dismissal of Simfa's First Amended Complaint.  (ECF Nos. 56 at 6, 56-4 at 3).   The stay was reinstated, however, when Simfa filed a renewed motion to stay the administrative proceeding, attaching the Second Amended Complaint.  (ECF Nos. 56 at 6, 56-4 at 3).

[3] Relatedly, Defendants initially argued that Simfa's Article II challenge in Count 4 fails because

was exercising executive power, not legislative power, in connection with enforcement of the OSC/ISO. *See generally* (ECF No. 56).

In its response, Simfa argues that: (i) as to Counts 1 and 2, the Supreme Court's opinion in *Securities and Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024), conclusively establishes Simfa's Seventh Amendment right to a jury trial in an Article III court; (ii) as to Count 3, Simfa is not required to exhaust its administrative remedies by participating in what it deems to be an "unconstitutional hearing" because this Court can assert jurisdiction to hear its claims under 21 U.S.C. § 824(d)(1) and 28 U.S.C. § 1331; (iii) as to Count 4, DEA ALJs are unconstitutionally insulated from removal and Simfa sufficiently alleged harm; and (iv) as to Count 5, Congress failed to give the AG an "intelligible principle" to direct DEA's administrative enforcement actions and DEA engaged in impermissible rulemaking, in violation of the nondelegation doctrine. *See generally* (ECF No. 59).

In addition, Simfa has filed a Cross-Motion for Summary Judgment, arguing that the Seventh Amendment guarantees its right to a jury trial on DEA's revocation proceeding and seizure of Simfa's private property. *See generally* (ECF Nos. 62, 62-1). Defendants, in turn, filed an Omnibus Response, addressing Simfa's opposition to Defendants' Motion to Dismiss and responding to Simfa's Cross-Motion for Summary Judgment. *See generally* (ECF No. 66).

Each Motion is addressed below.

---

DEA ALJs are subject only to a single layer of removal for-cause and, even if they were protected by two layers of removal restrictions, that removal scheme would still be constitutional. (ECF No. 56 at 3, 14-18). More recently, however, Defendants filed a Notice of Change in Position, advising the Court that the Acting Solicitor General has decided that the removal protections in 5 U.S.C. § 7521 "do not comport with the separation of powers and Article II of the U.S. Constitution." (ECF No. 70 at 1). Nevertheless, Defendants maintain that Simfa is not entitled to relief on this claim "because it fails to allege 'harm' with the requisite specificity, and therefore must be dismissed." *Id*. at 2.

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).  "[T]o survive a motion to dismiss[,] a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion to dismiss, a court generally must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).  A court is ordinarily limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim.  *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  While courts are required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678; *see also Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) ("Legal conclusions without adequate factual support are entitled to no assumption of truth.").

### B.     Motion for Summary Judgment

The court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    The parties may support their positions by citation to the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c).   An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party."  *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).    In turn, a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*   (quoting *Anderson*, 477 U.S. at 248).   The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Maximiliano v. Simm Assocs., Inc.*, No. 17-CV-80341, 2018 WL 783104, at *3 (S.D. Fla. Feb. 8, 2018); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Stanley Indus., Inc. v. W.M. Barr & Co., Inc.*, 784 F. Supp. 1570, 1572 (S.D. Fla. 1992) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).   But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving] party." *Anderson*, 477 U.S. at 252.   Moreover, the court does not weigh conflicting evidence or decide factual issues.   *Maximiliano*, 2018 WL 783104, at *3 *Gross v. S. Ry. Co.*, 414 F.2d 292, 297 (5th Cir. 1969).[4]

The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Maximiliano*, 2018 WL 783104, at *3; *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).   If the movant satisfies this burden, then "the burden shift[s] to the nonmoving party to

---

[4] Pursuant to *Bonner v. Pritchard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered before October 1, 1981.

demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).   The non-moving party must make a sufficient showing on each essential element of the case for which it has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   In so doing, the non-moving party must produce evidence, going beyond the pleadings, and "by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Mid-Continent Cas. Co. v. Arpin & Sons, LLC*, 261 F. Supp. 3d 1245, 1249 (S.D. Fla. 2017) (citing *Celotex Corp.,* 477 U.S. at 324).   "Thus, the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleadings, but must set forth specific facts showing that there is a genuine issue for trial.'"  *Mid-Continent Cas. Co*., 261 F. Supp. 3d at 1250 (citing *Anderson*, 477 U.S. at 248).   If a genuine issue of fact exists for trial, summary judgment should not be granted.  *See* Fed. R. Civ. P. 56(a).

### C.      The Controlled Substances Act

Relevant to the Motions is the Controlled Substances Act (the "CSA").   The CSA, 21 U.S.C. § 801, *et seq.*, establishes a "comprehensive regime" to "conquer drug abuse and control the legitimate and illegitimate traffic in controlled substances."  *Gonzales v. Raich*, 545 U.S. 1, 12 (2005).  In enacting the CSA, "Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels."  *Id*. at 12-13.  "To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA."  *Id.* at 13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)).

All persons engaged in the "legitimate distribution chain" of controlled substances, including pharmacies, must obtain proper registration from the AG under criteria set forth in

8

21U.S.C. § 823.  H.R. Rep. No. 91-1444, pt. 1, at *4569, 4589 (1970); *see* 21 C.F.R. § 1301.11(a); *Pharmacy v. Drug Enf't Admin.*, No. 20-CV-14626, 2022 WL 444357, at *1 (11th Cir. Feb. 14, 2022), *cert. denied sub nom. Suntree Pharmacy v. Drug Enf't Admin.*, 143 S. Ct. 305 (2022) (citing *Jones Total Health Care Pharmacy, LLC v. Drug Enf't Admin.*, 881 F.3d 823, 827 (11th Cir. 2018)).  The AG, in turn, has delegated her authority to deny, revoke, or suspend pharmacy registrations to the DEA Administrator.  21 U.S.C. § 824; 28 C.F.R. § 0.100; *see also Pharmacy*, 2022 WL 444357, at *2 (citing *Jones Total Health Care Pharmacy*, 881 F.3d at 827) ("The Attorney General has delegated his authority to deny, revoke, or suspend pharmacy registrations to the Drug Enforcement Administration.").  Pursuant to § 823, DEA issues registrations to individuals or pharmacies to distribute controlled substances listed in the Schedules.  21 U.S.C. §§ 823(b), (f).  DEA will issue a certificate of registration unless it "determines that the issuance of such registration is inconsistent with the public interest." 21 U.S.C. §§ 823(b), (f).  In evaluating the public interest, DEA considers the following factors: (i) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels; (ii) compliance with applicable State and local law; (iii) prior conviction record of the applicant under Federal or State laws relating to the manufacture, distribution, or dispensing of such substances; (iv) past experience in the distribution of controlled substances; and (v) such other factors as may be relevant to and consistent with the public health and safety. 21 U.S.C. §§ 823(b), (f).

Furthermore, DEA can suspend or revoke an existing registration upon finding that a registrant "has committed such acts as would render [its] registration under [21 U.S.C. § 823] inconsistent with the public interest."   21 U.S.C. § 824(a)(4); *see* 21 C.F.R. § 1301.36(a). Ordinarily, when DEA intends to suspend or revoke a registration, it must serve an Order to Show

Cause on the registrant and provide the registrant an opportunity for a hearing before an ALJ to contest the proposed suspension or revocation in advance of the agency action.  21 C.F.R. §§ 1301.36(d), 1301.37; *see Jones Total Health Care Pharmacy*, 881 F.3d at 827 (citing 21 U.S.C. § 824(c)).  The Order to Show Cause must provide the registrant with the time and place for the administrative hearing, a statement of the legal basis for the proposed suspension or revocation, and a summary of the matters of fact and law asserted.  21 C.F.R. § 1301.37(c).

Nonetheless, in cases presenting "an imminent danger to the public health or safety," DEA may issue an Immediate Suspension Order along with the Order to Show Cause.  21 U.S.C § 824(d); 21 C.F.R. § 1301.36(e).  "'Imminent danger to the public health or safety' means that, due to the failure of the registrant to maintain effective controls against diversion or otherwise comply with the obligations of a registrant . . . there is a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration."  21 U.S.C § 824(d)(2); *Heartland Pharmacy, Inc. v. Rosen*, No. 21-CV-14037, 2021 WL 650350, at *3 (S.D. Fla. Feb. 18, 2021).  The Order to Show Cause and Immediate Suspension Order must "contain a statement of [its] findings regarding the danger to public health or safety."  21 C.F.R. § 1301.36(e); *see also* (ECF No. 50-2) (Simfa's OSC/ISO).  An Immediate Suspension Order under § 824(d) remains in effect until: (i) DEA issues a final order ending it; (ii) it is withdrawn by the AG; or (iii) it is dissolved by a "court of competent jurisdiction."  21 U.S.C § 824(d)(1).

After an Order to Show Cause and Immediate Suspension Order is served, the registrant has 30 days to request a hearing before a DEA ALJ to address the issues therein.  21 C.F.R. § 1301.42; *see* 21 C.F.R. § 1301.43(a); *see also* (ECF No. 56-1 at 2) (Simfa's Request for Hearing); (ECF No. 50-2) (Simfa's OSC/ISO).  Proceedings before the ALJ are governed by 21 C.F.R.

10

§§ 1301.42-1301.46, 21 C.F.R. §§ 1316.41-1316.67, and select provisions of the Administrative

Procedure Act, 5 U.S.C. §§ 551-59 (the "APA").  21 C.F.R. § 1301.41(a).  DEA bears the burden

of proving that the requirements for revocation are satisfied.  *Id*. at § 1301.44(e).  During the

administrative proceedings, the registrant may: (i) be represented by counsel, *id*. at § 1316.50;

(ii) submit documentary and witness testimony to support its defense, *id*. at §§ 1316.57-1316.59;

(iii) obtain evidence through subpoenas, *id*. at § 316.52(d); and (iv) present legal argument at the

opening and close of evidence, *id*. at § 1301.42.

After the hearing, the ALJ prepares a report containing her recommended findings and

rulings, to which the parties may object.  *Id*. at §§ 1316.65(a), 1316.66.  Once the record is

complete, the ALJ delivers the certified record to the DEA Administrator, who issues the final

order to grant, deny, revoke, or suspend a registration.  *Id*. at § 1301.46; *see* 21 C.F.R. § 1316.65(c).

The Administrator's final order marks the end of DEA's administrative process.  *See United States*

*v. Robinson*, No. 12-CV-20319, 2012 WL 3984786, at *4 (S.D. Fla. Sept. 11, 2012) (citing

21 C.F.R. § 1316.67).  If the Administrator's final order denies, revokes, or suspends a registration,

the order must specify the findings of fact and conclusions of law upon which it is based.

21 C.F.R. § 1316.67.  Lastly, a registrant may seek review of the Administrator's final order "in

the United States Court of Appeals for the District of Columbia or for the circuit in which [its]

principal place of business is located."  21 U.S.C. § 877.

## III.   DISCUSSION

### A.   Defendants' Motion to Dismiss

The Court first considers Defendants' Motion to Dismiss.  (ECF Nos. 55, 56).  In

considering the Motion to Dismiss, the Court must accept the allegations in the SAC as true and

evaluate all plausible inferences derived from those facts in favor of Simfa.  *See, e.g.*, *Chaparro*,

11

693 F.3d at 1335.  In the Motion to Dismiss, Defendants argue that even accepting the allegations in the SAC as true and drawing all inferences in Simfa's favor, the SAC nonetheless fails to state a claim upon which relief can be granted as to Counts 1, 2, 4, and 5, and as to Simfa's structural due process allegations in Count 3.  *Id.* at 7; *see* Fed. R. Civ. P. 12(b)(6).  As to Simfa's as-applied due process challenge within Count 3, Defendants further argue that this, too, should be dismissed for failure to allege facts to support subject matter jurisdiction.  (ECF No. 56 at 6); *see* Fed. R. Civ. P 12(b)(1).

Relevant to both Motions, the parties agree that this Court has jurisdiction to hear Simfa's challenges to the constitutionality of DEA's administrative scheme (i.e., structural challenges), as alleged in Counts 1, 2, 3, 4, and 5 of the SAC.  (ECF No. 66 at 13-14).  The parties disagree, however, on whether the undersigned has jurisdiction to hear Simfa's as-applied due process claim within Count 3.  The jurisdictional issues as to Simfa's as-applied challenge in Count 3 are addressed separately in this Report.  *See* Section (III)(A)(2)(c).

### 1.  *Counts 1 and 2 (Seventh Amendment and Article III Violations)*

Defendants seek dismissal of Count 1 arguing that Simfa is not entitled to a jury trial because the DEA revocation proceeding "is not 'legal in nature' where it seeks only injunctive relief and does not sound in a common law cause of action."  (ECF No. 56 at 7); *see* (ECF No. 66 at 5-10).  Defendants also argue that Count 2 should be dismissed because a DEA registration to dispense controlled substances is "public right" that does not implicate Article III or the Seventh Amendment.  (ECF Nos. 56 at 9-11, 66 at 9-11).  Because Counts 1 and 2 are the subject of Simfa's Cross-Motion for Summary Judgment, *see generally* (ECF Nos. 62, 62-1), the undersigned addresses these arguments in Section (III)(B), below.

### 2. *Count 3 (Due Process Violations)*

Reading Count 3 liberally, Simfa alleges both structural and as-applied challenges to DEA's administrative structure.  (SAC ¶¶ 117-21).  More specifically, Count 3 alleges that DEA's administrative structure violates due process because it: (i) impermissibly combines prosecutorial and adjudicative functions (SAC ¶¶ 118-20); (ii) deprives Simfa of "protected liberty and property interests without any notice or a hearing or [a] prompt post-deprivation process" (SAC ¶ 121); (iii) "retroactively creates arbitrary and capricious new legislative rules" based on the opinions of Simfa's competitor (SAC ¶ 121); and (iv) selectively and arbitrarily enforces the newly created rules solely against Simfa (SAC ¶ 121).  Defendants argue that Simfa's due process claims, whether structural or as-applied, fail as a matter of law.  *See* (ECF Nos. 56 at 11-13, 66 at 12-17). For the reasons discussed below, the undersigned agrees with Defendants.

#### a.   Preliminary Jurisdictional Considerations

As to Count 3, Defendants argue that Simfa's structural challenges to DEA's administrative structure (i.e., combination of functions, lack of notice or hearing, and creation of arbitrary and capricious new legislative rules) are "foreclosed by Supreme Court precedent."  (ECF No. 56 at 11); *see* (ECF No. 66 at 14).  Nonetheless, Defendants concede, and the undersigned finds, that this Court has jurisdiction to entertain Simfa's structural due process challenge to DEA's administrative structure because exhaustion of administrative remedies is not required. (ECF Nos. 56 at 11-13, 66 at 13-14); *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489-91 (2010) (finding district court had jurisdiction to review constitutional challenge to structure of Public Company Accounting Oversight Board within the Securities and Exchange Commission ("SEC") without administrative exhaustion of claims through statutory review scheme); *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 195-96 (2023) (holding statutory

review schemes of SEC and Federal Trade Commission ("FTC") did not displace the district court's federal-question jurisdiction over claims challenging the constitutionality of the agencies' structure or existence); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 208 (2020) (reviewing constitutional challenge to the structure of the Consumer Financial Protection Bureau made in federal district court); *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 244, 251 (2018) (resolving circuit split over status of SEC's ALJs and finding SEC's structure violates the Appointment's Clause).

As to Simfa's as-applied due process claim (i.e., allegations of selective and arbitrary enforcement against Simfa), however, Defendants assert that the Court lacks jurisdiction because these are the "sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision," which fall outside the scope of *Axon Enterprise v. Federal Trade Commission,* 598 U.S. 175 (2023) and *Thunder Basin Coal v. Reich*, 510 U.S. 200 (1994).  (ECF Nos. 56 at 13, 66 at 16-17).  As discussed below, the undersigned agrees that Simfa's as-applied challenges are not appropriately before the Court and should be dismissed.

### b.   Simfa's Structural Due Process Challenge

Pursuant to Rule 12(b)(6), Defendants move to dismiss the procedural due process claims within Count 3 challenging the constitutionality of DEA's administrative scheme.  (ECF No. 56 at 6-7).  To withstand Defendants' Rule 12(b)(6) challenge, Simfa must plead enough facts to state a claim that is "plausible on its face."  *Alcon Lab'ys, Inc. v. Allied Vision Group, Inc.,* No. 18-CV-61638, 2019 WL 2245584, at *1 (S.D. Fla. Mar. 7, 2019) (citing *Iqbal*, 556 U.S. at 678).  Moreover, in considering Defendants' Motion to Dismiss under Rule 12(b)(6), the Court conducts a "two-pronged approach."  *Alcon Lab'ys*, 2019 WL 2245584, at *2.  First, the Court asks "whether the pleading properly asserts 'well-pleaded factual allegations,' or instead merely asserts legal

14

conclusions that are not entitled to the assumption of truth." *Id.* (citations omitted).  Second, if the SAC contains factual allegations that are well pled, then the Court must assume their veracity and proceed to the next step to determine whether the factual allegations "plausibly give rise to an entitlement to relief." *Id.* (citations omitted).  Thus, if the SAC asserts "non-conclusory, factual allegations that, if true, would push the claim 'across the line from conceivable to plausible,'" the Motion to Dismiss should be denied. *Id.* (quoting *Twombly*, 550 U.S. at 570).

In Count 3, Simfa alleges a deprivation of property (i.e., its COR and inventory) without due process.  *See* (SAC ¶ 121).  The Fifth Amendment protects individuals from deprivation of life, liberty, or property without due process of law, which requires fair notice and an opportunity to be heard.  U.S. Const. Amend. V.  The "hallmarks of procedural due process are adequate notice and a meaningful opportunity to be heard." *Heartland Pharmacy*, 2021 WL 650350, at *5; *see Sharma v. Drug Enf't Agency*, 511 F. App'x 898, 902 (11th Cir. 2013).  Case law is well-settled that a post-deprivation hearing affords adequate procedural due process where the government's swift action is necessary to protect important governmental or public interests.  *Heartland Pharmacy,* 2021 WL 650350, at *5 (citing *Delahoussaye v. Seale*, 788 F.2d 1091, 1095 (5th Cir. 1986)); *see Sharma*, 511 F. App'x at 902 (noting that there is "no due process violation where the government has made available a post-deprivation remedy sufficient to correct an alleged procedural deprivation").

### i.   *Notice and Opportunity to be Heard*

Count 3 alleges that Simfa was denied notice and an opportunity to be heard.  *See* (SAC ¶¶ 118, 121).  After describing the existing administrative review process, *see* (SAC ¶¶ 50-58), Count 3 incorporates by reference the allegations in Paragraphs 1 through 93 of the SAC, (SAC ¶ 117).  In relevant part, Count 3 alleges that:

71. [DEA expert Thomas] Hamilton now claims, and the [OSC/ISO] finds, for the first time that no reasonable pharmacist would ever fill more than 2-3 months of an immediate release or short-acting opioid for any patient under any circumstances and regardless of the patient's condition because any such prescription is a "red flag" that is "*unresolvable* after 2-3 months of dispensing."   Exhibit B at 4 (emphasis added).

* * *

73. DEA immediately suspended [Simfa]'s registration because it did not comply with this new medical policy judgment and prescribing standard DEA, and Hamilton, adopted for the first time in the [OSC/ISO].  DEA clearly never provided any prior notice to [Simfa] of this new rule or any opportunity to meet its requirements before being punished by immediate suspension without notice and seizure of its property.

* * *

118. The entire structure of the administrative hearing process is fundamentally unfair and fails to provide [Simfa] of notice and a meaningful opportunity to be heard and a decision by a fair, impartial, and neutral adjudicator.

* * *

121. The [OSC/ISO] deprived [Simfa] of these protected liberty and property interests without any notice or a hearing or the prompt post-deprivation process required by due process, retroactively creates arbitrary and capricious new legislative rules (based on the meritless opinions of [Simfa]'s competitor contradicted by his prior testimony), and selectively and arbitrarily enforces them only against [Simfa] and no other registrant.

(SAC ¶¶ 71, 73, 118, 121).

Contrary to the allegations in Count 3, however, other paragraphs in the SAC reflect that Simfa in fact had both notice and an available post-deprivation remedy/opportunity to be heard. As to notice, Simfa became aware of DEA's investigation in December 2021, when DEA executed an Administrative Inspection Warrant at Simfa's business.  *See* (ECF Nos. 50 at 13, 56-2 at 2-4). In April 2023, approximately a year and a half later, DEA issued the OSC/ISO, putting Simfa on notice of its alleged violations of the CSA.  In addition, as required by the CSA, the OSC/ISO contained a non-exhaustive summary of the facts, laws, and regulations that Simfa had allegedly violated, and described several "red flags" of diversion that Simfa had purportedly failed to resolve.  (ECF No. 50-2 at 5-9).  These "red flags" included: (i) dispensing immediate-release opioids containing high morphine milligram equivalents on a regular basis over a significant period

of time; (ii) dispensing dangerous combinations of controlled substances (i.e., "drug cocktails"); (iii) charging higher prices for controlled substances as compared to other local pharmacies and accepting cash payments; and (iv) dispensing controlled substances to patients who traveled unusually long distances to obtain their prescriptions. *See id*. Based on Simfa's failure to resolve these red flags, DEA concluded that Simfa's continued registration posed "'an imminent danger to the public health or safety' because of the 'substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur' in the absence of this suspension." *Id*. at 10 (quoting 21 U.S.C. § 824(d)). Measured against these allegations in the SAC, Simfa's argument as to lack of notice fails. *See Heartland Pharmacy*, 2021 WL 650350, at *6 (finding pharmacy unlikely to prevail on its procedural due process claim because pharmacy had notice of DEA's investigation and an adequate opportunity to be heard at the post-deprivation administrative proceedings).

Similarly, the SAC and attached exhibits reflect that Simfa had an adequate opportunity to be heard. As in *Heartland Pharmacy*, the OSC/ISO outlines the steps Simfa could take to obtain agency review of the OSC/ISO. *Id*. Indeed, the OSC/ISO provided:

> 1. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, Respondent may file with DEA a written request for a hearing in the form set forth in 21 C.F.R. § 1 316.47. *See* 21 C.F.R. § 1301 .43(a). If Respondent fails to file such a request the hearing shall be cancelled in accordance with paragraph 3, below.
>
> 2. Should Respondent request a hearing and fail to timely file an answer, plead, or otherwise defend, or should Respondent request a hearing and then fail to appear at the designated hearing, Respondent shall be deemed to have waived the right to a hearing and to be in default, and DEA may enter an order terminating the proceeding. *See* 21 C.F.R. §§ l301.43(c)(2), (c)(3), (d).
>
> 3. Default constitutes a waiver of Respondent's right to hearing and an admission of the factual allegations of this Order to Show Cause and Immediate Suspension of Registration. *See* 21 C.F. R. § 1301.43(e). In the event that Respondent is deemed in default or an order terminating the proceedings has been issued, DEA

> may enter a default final order pursuant to 21 C.F.R. § 1316.67.  *See* 21 C.F.R.
> § 1301.43.(f)(l).

(ECF No. 50-2 at 11); *see also* (SAC ¶¶ 50-58) (Simfa's recitation of existing administrative

review process).

 In compliance with DEA's administrative procedures, Simfa timely requested a hearing

before an ALJ and participated briefly in the administrative proceeding.  *See* (ECF Nos. 56 at 2,

6, 56-1 at 2).  Simfa then requested a stay prior to a merits determination, which the ALJ granted.

*See* (ECF Nos. 56 at 2, 6, 56-3 at 2-4, 56-4 at 2-10).  Moreover, Simfa acknowledges that the CSA

provides registrants with an instant avenue for federal court review of an Immediate Suspension

Order by allowing the registrant to move for a temporary injunction of the suspension during the

pendency of the administrative proceeding.  *See* (ECF No. 59 at 10) (citing *Novelty Distribs. v.

Leonhart*, 662 F. Supp. 2d 20, 21 (D.D.C. 2008)) (Simfa's acknowledgment that 21 U.S.C.

§ 824(d) permits registrants to seek injunctive relief of the suspension order before it becomes

final); 21 U.S.C. § 824(d)(1); *see also Novelty Distribs.,* 662 F. Supp. 2d at 21 (noting that although

the registrant's motion to enjoin the suspension of its registration pending the agency's final

decision was properly before the court, the registrant nonetheless did not satisfy the standards for

a preliminary injunction).  But Simfa did not avail itself of this remedy.

 For the foregoing reasons, Simfa's structural due process challenge based on lack of notice

and opportunity to be heard should be dismissed, as these general allegations do not "plausibly

give rise to an entitlement to relief."  *Alcon Lab'ys.,* 2019 WL 2245584, at *2 (citation omitted).

    *ii.* *Combination of Functions*

 Count 3 further alleges that the comingling of investigatory, prosecutorial, and adjudicatory

functions within DEA's administrative structure violates Simfa's due process rights.  (SAC ¶¶ 119-

20).  As to the combination of functions, the SAC alleges:

36. The seizure of controlled substances pursuant to this authority provides the seizing Government law enforcement agency (i.e., the Attorney General or DEA) with a direct financial stake in the outcome of the administrative revocation action adjudicated by the Agency (and any enforcement action brought in an Article III court) and an even further motivation to rule for itself in these cases and revoke the registration.

37. DEA and the Administrator are well aware of the relationship between the CSA's forfeiture provision and its adjudication of administrative revocation and suspension orders in its favor.  This has significantly influenced its decisions even in moot cases.  *S & S Pharmacy, Inc.*, 78 Fed. Reg. 57656, 57658-60 (2013).

38. It is easier and more convenient for the Defendants to forfeit registrants' private property to the Government by bringing an administrative sanctions proceeding against the registrant within the Agency instead of bringing an enforcement action in Article III court.

* * *

41. DEA has three (3) ALJs appointed under the APA in administrative sanction actions brought within DEA by the Administrator by issuance of an order to show cause.  Two (2) of these three (3) ALJs are former DEA attorneys.

* * *

43. DEA is represented in these cases by DEA's office of counsel who prosecute the case for the Administrator.  The Administrator has been known to favor DEA's attorneys, shore up their cases for them, and fix their mistakes, when the case reaches her at the final order level after the hearing. John J. Mulrooney, II & Katherine E. Legel, *Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters,* 101 Marquette Law Rev. 333 (2017).

44. After [Simfa] requested a hearing, DEA assigned Administrative Law Judge (hereinafter referred to as "ALJ") and former DEA lawyer Teresa Wallbaum to preside over the case.

45. ALJ Walbaum represented the DEA for many years in various matters, including defending the Administrator's final orders revoking practitioners' registrations against challenges that were brought against them in Article III courts.

* * *

56. The Administrator ultimately decides all administrative revocation actions and serves as the prosecutor, judge, and jury in her own case.  After receiving the certified record and ALJ's report, the Administrator issues a final order – often times years later – which sets forth the Agency's final decision, the final findings of fact, and conclusions of law upon which it is based that is published in the Federal Register.  21 C.F.R. § 1316.67.

57. Not surprisingly, DEA's track record in administrative revocation actions it commences before itself and decides itself is astounding. In the past thirty (30) years, the Agency has never lost a case or ruled against itself in any significant way and has always imposed the sanction it wants against a practitioner (e.g., doctor or pharmacist) in registration sanction cases adjudicated inside the Agency.

* * *

69. As with every other expert DEA uses for its administrative enforcement cases, DEA ALJs and the Administrator, not surprisingly, always accepted Hamilton's opinions and credited them over the registrants' experts' opinions in every administrative revocation case Hamilton has testified for the DEA in its internal enforcement cases.

* * *

82. [Simfa] is displeased with the ALJ's handling of the instant administrative proceeding it was forced to submit to.  The ALJ has acted as an advocate for DEA in the proceeding, is heavily biased in favor of DEA and against [Simfa] and demonstrated it in her rulings and hostile treatment of the parties.  There is no right to any discovery without the permission of the ALJ, which is routinely denied.  She denied every motion [Simfa] filed in the proceeding (even when unopposed and at times immediately after filing without hearing anything from DEA's counsel) except extensions of certain hearing deadlines and a stay of these proceedings she granted only to vacate that order *sua sponte* on September 9, 2024 for no valid reason after she researched and reviewed the public docket in this lawsuit and Order.

83. Additionally, the ALJ denied [Simfa]'s <u>unopposed</u> motions for consent to conduct third party discovery as to matters that were highly relevant and material to [Simfa]'s defense to DEA's claims and evidence that clearly negated them (which the ALJ denied because she believed they were "not necessary"), and DEA's alleged expert, Hamilton, including critical issues such as his credibility and reliability of his testimony.

* * *

119. The Administrator of the DEA acts as prosecutor, judge, and jury in her own administrative proceeding against [Simfa] over which she has complete control.

120. Thus, the DEA's administrative proceedings violate the ancient maxim—protected by the Due Process Clause—*nemo iudex in causa sua* ("no one should be a judge in his own cause").  *See, The Federalist No. 10* ("No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and not improbably, corrupt his integrity.") (Madison).

(SAC ¶¶ 36-38, 41, 43-45, 56-57, 69, 82-83, 119-20).

While the combination of investigative and adjudicative functions does not, without more,

constitute a due process violation, the Supreme Court has noted that there may be "special facts

and circumstances" in a particular case that may pose an "intolerably high" risk of unfairness. (ECF No. 56 at 12) (quoting *Withrow v. Larkin*, 421 U.S. 35, 58 (1975)).  Here, however, Count 3 does not allege any "special facts and circumstances" evidencing "such a risk of actual bias or prejudgment" necessary to sustain a due process claim in this context.  *See Withrow*, 421 U.S. at 47.  Rather, Simfa's general and unsupported allegations of implicit bias in DEA's administrative scheme, without more, are insufficient to present a plausible claim and should be dismissed. Although Simfa may be "displeased" with the ALJ's rulings on motions or the overall lack of discovery offered in the administrative setting, Simfa fails to allege the type of conduct by Defendants that would state a plausible due process violation.  *See e.g., Sharma v. Drug Enf't Agency,* No. 10-CV-20508, 2010 WL 11483805, at *11 (S.D. Fla. Nov. 10, 2010), *aff'd* 511 F. App'x 898 (11th Cir. 2013) (finding no due process violation in *Bivens* action resulting from DEA's revocation of registration where plaintiff did not allege "egregious conduct . . . or conduct that shocks the conscience"); *see also Withrow*, 421 U.S. at 47 (noting that "[t]he contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry" and "must overcome a presumption of honesty and integrity in those serving as [ALJs]"); *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (rejecting a due process objection to the combination of investigator and adjudicator roles in the Social Security Administration and noting that this argument "assumes too much and would bring down too many procedures designed, and working well").  Accordingly, the allegations in Count 3 regarding unconstitutional combination of functions should also be dismissed.

c.   Simfa's As-Applied Due Process Challenge

Next, Count 3 alleges an as-applied due process violation.  *See* (SAC ¶ 121) (alleging selective and arbitrary enforcement only against Simfa).  Relevant to the Motion, the CSA provides that:

> The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety. . . . A suspension under this subsection shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.

21 U.S.C. § 824(d)(1).  According to Simfa, this provision "explicitly vests this Court with jurisdiction to dissolve the [OSC/ISO] issued by DEA."  (ECF No. 59 at 2).  Simfa also relies on *Axon Enterprise* to support its argument that this Court has jurisdiction to hear its as-applied due process challenge.  (ECF Nos. 50 at 3, 59 at 2).  The Court disagrees.

In *Axon Enterprise*, the issue before the Court was whether respondents in separate enforcement actions brought by the SEC and FTC could properly file suit in district court to challenge the constitutionality of the underlying agency proceedings prior to completing the administrative process.  598 U.S. at 180.  The Supreme Court evaluated three factors to determine whether claims concerning agency action are reviewable by federal courts or whether they are "of the type Congress intended to be reviewed within th[e] statutory structure."[5]  *Id*. at 186 (citing *Thunder Basin*, 510 U.S. at 207-13).  These factors include whether: (i) precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (ii) the claim was "wholly collateral" to the statute's review provisions; and (iii) whether the claim falls "outside the agency's expertise."  *Id.* (citing *Thunder Basin*, 510 U.S. at 212-13).  Applying these factors, the

---

[5] These factors are generally known as the *Thunder Basin* factors.  *See Axon Enter.*, 598 U.S. at 186; *Thunder Basin*, 510 U.S. at 212-13.

Supreme Court concluded that the district court had jurisdiction to hear respondents' claims and reversed the district court's decision that it lacked jurisdiction.  *Id.* at 196.  More specifically, the Court reasoned that: (i) preclusion of district court jurisdiction could foreclose all meaningful judicial review; (ii) respondents' challenges to the SEC's and FTC's authority were totally distinct from, i.e., collateral to, the type of enforcement matters that the agencies regularly adjudicated; and (iii) respondents' structural constitutional challenges fell beyond the agencies' areas of expertise (i.e., outside the types of issues that the statutory review schemes typically considered).  *Id.* at 190-95.

Applying the *Thunder Basin* factors to the instant matter, the undersigned determines whether Simfa's as-applied due process claim is reviewable in federal court or whether it is "of the type Congress intended to be reviewed within th[e] statutory structure."  *Axon Enter.*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212).  Thus, the undersigned considers whether: (i) precluding this Court's jurisdiction would "foreclose all meaningful judicial review" of Simfa's claim; (ii) the claim is "wholly collateral" to the statute's review provisions; and (iii) the claim falls "outside the agency's expertise."  *Axon Enter.,* 598 U.S. at 186 (citing *Thunder Basin*, 510 U.S. at 212-13).

As to the first factor, precluding federal court jurisdiction at this stage of the litigation does not foreclose meaningful judicial review.  As Simfa acknowledges, Simfa has the right to appeal DEA's final determination directly to the Eleventh Circuit.  21 U.S.C. § 877; *see Thunder Basin*, 510 U.S. at 215 (precluding district court review where "petitioner's statutory and constitutional claims . . . can be meaningfully addressed in the Court of Appeals").

As to the second factor, the undersigned finds that Simfa's allegations of improper combination of functions and selective and arbitrary enforcement are not "wholly collateral" to the

administrative review of the OSC/ISO.  To be clear, *Axon* recognized "a narrow exception to [the] prescribed path for judicial review of agency action for facial challenges to the *constitutional structure* of administrative agencies' ability to operate."  *Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 WL 7294839, at *11 (D.C. Cir. May 25, 2023) (emphasis added).  Here, however, Count 3 alleges an as-applied challenge to DEA's process as to Simfa, which is different than *Axon's* structural challenge to the agency's administrative process as a whole.  *Id.* (noting that "[n]othing in *Axon* holds that every 'nonfrivolous' constitutional objection to every agency proceeding . . . , especially fact-bound as-applied claims to a particular exercise of agency jurisdiction, can bypass the congressional scheme established for judicial review.").

Lastly, as to the third factor, challenges to the enforcement (or selective enforcement) of the rules regulating the distribution of controlled substances are issues falling squarely within DEA's area of expertise.  *See Thunder Basin*, 510 U.S. at 215 (quoting *Whitney Nat. Bank in Jefferson Par. v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 420 (1965)) (finding "exclusive review before the Commission is appropriate since 'agency expertise [could] be brought to bear on' the statutory questions presented here").  Accordingly, the Court should dismiss Count 3's as-applied due process claims for lack of jurisdiction.

### 3.  *Count 4 (Article II - Separation of Powers Violation)*

Next, Defendants argue that Count 4, alleging a violation of Article II's separation of powers clause (based on the ALJ's dual-layer of "for-cause" removal protections) fails to allege "harm" with sufficient specificity and should therefore be dismissed.  *See* (ECF No. 56 at 14-15). Initially, Defendants also argued that Simfa's Article II challenge failed because DEA ALJs are subject only to a single layer of removal for-cause and, even if they were protected by two layers

of removal restrictions, that scheme would nonetheless be constitutional.  *Id.* at 3, 14-18.

Defendants, however, have since filed a Notice of Change in Position, advising the Court that the

Acting Solicitor General has decided that the removal protections in 5 U.S.C. § 7521 "do not

comport with the separation of powers and Article II of the U.S. Constitution."  (ECF No. 70 at

1).  These arguments are addressed below.

Count 4 incorporates by reference the allegations in Paragraphs 1 through 93 of the SAC.

(SAC ¶ 122).  In relevant part, Count 4 alleges that:

46. [ALJ] Wallbaum is employed by the Merit System Protection Board ("MSPB").

\* \* \*

82. [Simfa] is displeased with the ALJ's handling of the instant administrative proceeding it was forced to submit to.  The ALJ has acted as an advocate for DEA in the proceeding, is heavily biased in favor of DEA and against [Simfa] and demonstrated it in her rulings and hostile treatment of the parties.  There is no right to any discovery without the permission of the ALJ, which is routinely denied.  She denied every motion [Simfa] filed in the proceeding (even when unopposed and at times immediately after filing without hearing anything from DEA's counsel) except extensions of certain hearing deadlines and a stay of these proceedings she granted only to vacate that order *sua sponte* on September 9, 2024 for no valid reason after she researched and reviewed the public docket in this lawsuit and Order.

83. Additionally, the ALJ denied [Simfa]'s *unopposed* motions for consent to conduct third party discovery as to matters that were highly relevant and material to [Simfa]'s defense to DEA's claims and evidence that clearly negated them (which the ALJ denied because she believed they were "not necessary"), and DEA's alleged expert, Hamilton, including critical issues such as his credibility and reliability of his testimony.

\* \* \*

124. DEA's scheme provides dual layer for-cause protection of both the ALJs and the MSPB because both parties are only removable "for-cause," thus insulating the ALJs in violation of Article II of the United States Constitution.  21 C.F.R. § 1316.52 provides that, "A presiding officer, designated by the Administrator, shall preside over all hearings."

125. DEA is unable to provide a DEA ALJ that is not subject to removal "for-cause," thus insulating all present DEA ALJs.  Therefore, DEA is unable to provide a constitutionally removable and accountable DEA ALJ to preside over [Simfa]'s hearing.

126. Furthermore, the DEA ALJ's dual layer for-cause statutory restrictions violate the President's Article II executive power.  Two layers of for-cause removal protections have been deemed unconstitutional.  *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477 (2010); *Myers v. U.S*., 272 U.S. 52, 117 (1926).  This dual-layer removal protection prohibits the President from faithfully executing the law under the Take Care Clause of the United States Constitution.  An ALJ must not be insulated from removal in order to satisfy separation of powers principles.

127. DEA's administrative hearing proceedings, including the proceedings in its enforcement action against [Simfa], are constitutionally defective because the statutory removal restrictions for DEA ALJs are unconstitutional.

128. The United States' initiation of proceedings against [Simfa] before an ALJ constitutes a "here-and-now" injury against [Simfa] because it is being subjected to executive power by an officer of the United States who is improperly shielded from removal.

129. [Simfa]'s injury is fairly traceable to the ALJ's application of executive Power against [Simfa].

130.  For this reason alone, DEA[']s entire administrative hearing process and the use of unaccountable DEA ALJs is unconstitutional.

(SAC ¶¶ 46, 82-83, 124-30).

a.   Count 4 Fails to Allege Resulting Harm

Relying on *Collins v. Yellen*, 594 U.S. 220 (2021), Defendants argue that Count 4 fails because Simfa "has [not] alleged that [DEA's removal] structure has impeded the President's ability to remove ALJ Wallbaum and that such impediment has affected [Simfa]'s revocation proceeding." (ECF No. 56 at 14).  In *Collins*, the Supreme Court found that the for-cause removal restriction of the single Director for the Federal Housing Finance Agency violated constitutional separation of powers and remanded the case for a determination of whether the unconstitutional removal provision caused actual harm.  594 U.S. at 260.  According to Defendants, "[e]very circuit court to have considered what a party must show to obtain relief on removal-protection claims has required a showing of causal harm."  (ECF No. 56 at 14-15) (citing *Bhatti v. Fed. Hous. Fin.*

*Agency*, 97 F.4th 556, 561 (8th Cir. 2024) (harm "must be connected in some way, or share some nexus with, the president's inability to remove" the official); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755-58 (10th Cir. 2024) (unconstitutional removal provision must have "actually affected the agency's decision or conduct against" challenger); *CFPB v. Nat'l Collegiate Master Student Loan Tr*., 96 F.4th 599, 613-16 (3d Cir. 2024) (same); *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) (collecting cases); *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023) (applying "but-for causation" to removal challenges), *cert. denied*, 2024 WL 2709347 (U.S. May 28, 2024); *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022) (similar), *rev'd per curiam on other grounds*, 598 U.S. 623 (2023); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) (same)); *see also Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022), *rev'd and remanded on other grounds*, 601 U.S. 416 (2024) (holding a party is entitled to relief on a removal claim where it alleges: "(1) a substantiated desire by the President to remove the unconstitutionally insulated actor; (2) a perceived inability to remove the actor due to the infirm provision; and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor").  Simfa does not address these out-of-circuit cases but claims that Defendants "read too much into *Collins*" by requiring Simfa to allege that the President or the AG must have actually sought to remove the presiding ALJ.  *See* (ECF No. 59 at 15).  Moreover, Simfa claims to have sufficiently alleged harm from the challenged removal protections.  *Id.* at 15-16.

Against this legal backdrop, the undersigned recommends that Count 4 be dismissed for failure to allege actual harm and causal connection resulting from the challenged removal structure.  Simfa's general allegations of "displeasure" with the ALJ's performance or the generic allegations of injuries in Paragraphs 128 and 129 fall far short of the actual harm and causal

27

connection required by *Collins*.[6]  To be clear, Count 4 fails to allege that the challenged removal restriction impeded the President's ability to remove ALJ Wallbaum and how such restriction adversely affected Simfa's minimal participation in the revocation proceeding.  *See Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 632.  This omission is fatal to Count 4.

> b.  Other Dual-Layer Protections Have Been Upheld as Constitutional

In light of Count 4's failure to allege specific harm from the removal protections, the undersigned need not address the constitutionality of DEA's ALJ removal structure.  Nonetheless, the undersigned notes that the Ninth Circuit has recently rejected the exact argument Simfa attempts to raise here regarding dual-layer removal protections, unequivocally holding that "that the removal protections under 5 U.S.C. § 7521 are constitutional as applied to DEA ALJs." *Rabadi v. U.S. Drug Enf't Admin.*, 122 F.4th 371 (9th Cir. 2024), *cert. denied*, No. 24-943, 2025 WL 1787728 (U.S. June 30, 2025).

As well, the Eleventh Circuit's opinion in *Walmart, Inc. v. Chief Administrative Law Judge of Office of Chief Administrative Hearing Officer*, 144 F.4th 1315 (11th Cir. 2025), further guides and supports the undersigned's recommendation that Count 4 be dismissed.  In *Walmart*, the Eleventh Circuit addressed whether the APA's § 7521(a) "good cause" removal procedure for DOJ ALJs in the Office of the Chief Administrative Hearing Officer ("OCAHO") unconstitutionally infringed upon the President's Article II executive power to "take care" that the laws are faithfully executed.  144 F.4th at 1319.  Like Simfa, Walmart did not claim that the ALJ was improperly appointed or had failed to perform her duties, nor did it claim that the AG or the President sought to remove the ALJ in question.  *Id.* at 1320-21.  Instead, Walmart's sole claim, like Simfa's, was

---

[6] Moreover, as discussed *supra*, Simfa's complaints about ALJ Wallbaum's rulings are not without recourse.  Consistent with the CSA's review structure, such rulings would properly be subject to review by the Eleventh Circuit should Simfa lose at its administrative hearing and seek review in federal court of the DEA Administrator's final decision.  21 U.S.C. § 877.

that § 7521(a) violated Article II by limiting removal to "good cause" as determined by the Merit Systems Protection Board ("MSPB").  *Id.* at 1321.  Like Simfa, Walmart argued that § 7521(a)'s removal restriction "doubly shielded" the OCAHO ALJs from presidential accountability (because MSPB members were also removable only for cause under 5 U.S.C. § 1202(d)), in violation of Article II, and should be declared unconstitutional.  *Id.*  The district court agreed and found that "Walmart's exposure to an unconstitutional adjudication" constituted an irreparable harm.  *Id.*  The defendants appealed.  *Id.*

Shortly before oral argument, however, defendants wrote a letter—very similar to Defendants' Notice of Change in Position (ECF No. 70)—notifying the Appellate Court that "the Acting Solicitor General ha[d] decided that the multiple layers of removal restrictions for [ALJs] in 5 U.S.C. § 7521 do not comport with the separation of powers and Article II and the United States will no longer defend them in litigation."  *Id.*  The Eleventh Circuit nonetheless found that its "review [was] unaffected by the defendants' new position on this constitutional, legal issue because § 7521(a) is a statute enacted by Congress, and parties cannot by agreement decide that the § 7521(a) statute is unconstitutional and unenforceable."  *Id.* at 1322.  Thus, the Court conducted a detailed analysis of the APA's framework, the Take Care Clause of Article II of the Constitution, Supreme Court precedent on removal restrictions, and legal precedent, including a circuit split on the constitutionality of § 7521's removal restriction for ALJs across different executive agencies.  *Id.* at *1322-42.  Ultimately, the Eleventh Circuit reversed the district court's decision and found the removal protection in § 7521(a) constitutional, considering that: (i) the OCAHO ALJs have limited duties and perform adjudicative rather than enforcement or policymaking functions; (ii) the ALJ's decisions are subject to direct and plenary review by a higher official (i.e., the Attorney General), who can be removed at will by the President; and

29

(iii) the Constitution explicitly grants Congress the power to appointment inferior officers, implying at least some authority in Congress to regulate the removal of inferior officers appointed by that department head. *Id*. at 1343-45. The Appeals Court rejected Walmart's argument that the additional removal restriction on MSPB members provided an unconstitutional second-layer of protection to the OCAHO ALJs under § 7521.[7] *Id*. at 1345-47 (distinguishing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)). Although the Eleventh Circuit limited its holding in *Walmart* to OCAHO ALJs, *see Walmart*, 144 F.4th at 1319, the Court's rationale applies with equal force to DEA ALJ's under the APA. Thus, *Walmart* provides persuasive support for the undersigned's conclusion that the two-layer for-cause removal restrictions, like that at issue here, are constitutional. *See id*. at 1343-47.

In sum, Count 4 should be dismissed. *Collins*, 594 U.S. at 260; *see Rodriguez v. Soc. Sec. Admin*., 118 F.4th 1302, 1314 (11th Cir. 2024) (holding social security claimant must show that he suffered some harm from Commissioner serving under unconstitutional removal provision to obtain retrospective relief). The SAC contains no allegations that anyone sought to remove ALJ Wallbaum and/or that the inability to remove ALJ Wallbaum, in fact, harmed Simfa. Rather, the only allegations of harm recount ALJ Wallbaum's purportedly adverse rulings (SAC ¶ 82) and general references in Paragraphs 126, 128, and 129 that the removal protections "prohibit[] the President from faithfully executing the law under the Take Care Clause" and that Simfa's "'here-and-now' injury" is "fairly traceable to the ALJ's application of executive Power against [Simfa]."

---

[7] Relatedly, the Eleventh Circuit found that "even if the APA's § 7521(a) removal restriction was unconstitutional as applied to the OCAHO ALJs, and regardless of whether we were to require Walmart to show the type of harm identified in *Collins*, the removal protection would be severable." *Id*. at 1349.

These allegations are woefully insufficient to show compensable harm under *Collins*. *Collins*,

594 U.S. at 260; *see Bhatti*, 97 F.4th at 561.

       4.   *Count 5 (Violation of Nondelegation Doctrine)*

      Count 5 incorporates by reference the allegations in Paragraphs 1 through 93 of the SAC.

(SAC ¶ 131).  In relevant part, Count 5 alleges a violation of the nondelegation doctrine, as follows:

> 28. The Attorney General can seek to revoke an existing registration and terminate the rights and authority of the registrant thereunder administratively by bringing an internal enforcement action that is adjudicated by the Attorney General and/or by bringing an enforcement action in an Article III court.  *See, e.g.*, 21 U.S.C. §§ 824(c)(4) (administrative revocation by Attorney General order is independent of, and not in lieu of, criminal prosecutions or other proceedings under the CSA, including judicial forfeiture proceedings, or any other federal law); 843 & 882.
>
>             * * *
>
> 60. Over the years, DEA has used administrative enforcement proceedings brought within the Agency to expand its limited authority under the CSA beyond its permissible reach to regulate the medical profession, pharmacists, and other practitioners generally, and supplant state medical boards and pharmacy boards exclusive authority over these professions through DEA's use of "experts" within the regulated community, hired and paid by the Agency, to identify practitioners to target for administrative enforcement proceedings, commence these proceedings against them within the Agency, and to establish DEA's prima facie case for sanctions at the hearing.
>
>             * * *
>
> 71. [DEA's expert] Hamilton now claims, and the [OSC/ISO] finds, for the first time that no reasonable pharmacist would ever fill more than 2-3 months of an immediate release or short-acting opioid for any patient under any circumstances and regardless of the patient's condition because any such prescription is a "red flag" that is "<u>*unresolvable*</u> after 2-3 months of dispensing."  Exhibit B at 4 (emphasis added).
>
> 72. DEA adopts this new rule in the [OSC/ISO] because, according to DEA, a law enforcement agency with no medical knowledge or expertise, extended release opioids such as fentanyl and Oxycontin are the only appropriate drugs that can be prescribed to treat pain of any type lasting more than "2-3 months" because these opioids are "generally more appropriate for the treatment of chronic pain."  *Id.* at 3.
>
> 73. DEA immediately suspended [Simfa]'s registration because it did not comply with this new medical policy judgment and prescribing standard DEA, and Hamilton, adopted for the first time in the [OSC/ISO].  DEA clearly never provided any prior notice to [Simfa] of this new rule or any opportunity to meet its

requirements before being punished by immediate suspension without notice and seizure of its property.

74. This "unresolvable after 2-3 months" rule is inconsistent with Hamilton's prior testimony for DEA in every case prior case he testified in for DEA and not even consistent with the opinions he offered DEA in a pending case that was before the Administrator awaiting her final decision at the time she issued the [OSC/ISO] against [Simfa].

75. DEA's "unresolvable after 2-3 months rule" radically departs from long-standing DEA precedent and positions on numerous matters, including the scope of the CSA and DEA's authority under it, countless DEA final decisions in the Federal Register before (and since), grossly inconsistent with each of the Defendants' positions on fentanyl and indeed virtually everything they have ever said on the subject, and not supported by any objective medical or scientific evidence.

76. DEA has never applied its "unresolvable after 2-3 months" rule in any action, order, proceeding except for [Simfa] or even communicated it to anyone other than [Simfa]. There is no evidence DEA has ever even mentioned it to anyone outside the Agency or adopted this position anywhere except for in its proceeding against [Simfa]. Numerous final Agency decisions in registration sanction proceedings issued by the Administrator after she suspended [Simfa] contradict DEA's position that dispensing an immediate release opioid is an "unresolvable red flag after 2-3 months of dispensing."

77. DEA also alleges a pharmacist may only fill one controlled substance prescription for a patient without insurance and must refuse to fill additional controlled substance prescriptions for that patient – effectively denying patients without medical insurance the right to healthcare.

* * *

80. As a direct and proximate result of the [OSC/ISO], [Simfa] and its pharmacists have lost the ability to exercise their preferred professional practice and treat patients, including the patients at issue in the [OSC/ISO] – many of whom had been customers for more than ten (10) years.

* * *

88. The Government also does not bring registration sanctions actions or enforcement proceedings exclusively before DEA for adjudication by it in-house or only seeks sanctions against registrants through administrative agency adjudications outside of Article III.

* * *

132. Congress unconstitutionally delegated legislative powers to the Attorney General (and his subdelegee – the DEA Administrator) in the CSA when it gave him unfettered discretion and authority to decide whether to bring enforcement actions within the Agency or in an Article III court. *Jarkesy*, 34 F.4th at 459-62.

133. This absolute discretion to decide whether to bring a registrant before an Agency tribunal instead of in an Article III court effectively gives the Attorney General and the Administrator the power to decide which registrants receive certain legal processes and protections (those accompanying Article III) and which should not without any guidance from Congress whatsoever on "the mode of determining" which cases are assigned to administrative tribunals – an area that "is completely within congressional control." *Crowell v. Benson*, 285 U.S. 22, 50 (1932).

134. The ability to determine which subjects of enforcement actions are entitled to Article III proceedings and the rights and protections attendant thereto and which in their unfettered discretion without laying down any rule or standard to guide it, has resulted in arbitrary, selective, unfair, enforcement actions based on the same alleged violations of the CSA, the same legal theories, for the same relief in two drastically different forums and allowed for voracious expansion of DEA's limited authority under the CSA to encroach upon state regulation of the medical and pharmacy professions, the tripartite structure of government designed by the constitution, and judicial functions reserved for Article III courts.

(SAC ¶¶ 28, 60, 71-77, 80, 88, 132-34).  Thus, Count 5 poses two nondelegation issues: (i) DEA's purported improper rulemaking, (ECF No. 59 at 18-19); and (ii) the AG's "unfettered authority to determine what action to bring and where he would bring it," *id.* at 20.  But these claims are unsupported and unpersuasive.

Defendants argue that Count 5 should be dismissed because the AG's decision whether to proceed administratively or in federal court is an exercise of executive power (not legislative power), and therefore does not implicate the nondelegation doctrine.  (ECF No. 56 at 19). Alternatively, Defendants argue that even if the decision were an exercise of legislative power, DEA's exercise of its discretion is adequately "guided by intelligible principles" in the CSA to survive a delegation challenge. *Id.*  at 19-20.

Relevant to Count 5, Article I of the Constitution vests the federal government's legislative powers in Congress, and Congress may not delegate those powers to an executive agency absent an "intelligible principle" to guide the exercise of its discretion.  U.S. Const. Art. I, § 1; *see, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  The "intelligible principle" standard is not

a high one. *Gundy v. United States*, 588 U.S. 128, 146 (2019). A delegation of power is permissible "if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" *Id.* (quoting *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 105 (1946)). "Legislative power . . . is the authority to make laws, but not to enforce them." *Buckley v. Valeo*, 424 U.S. 1, 139 (1976), *superseded by statute on other grounds in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003) (quoting *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928)). Conversely, "enforcement power," which includes the "discretionary power to seek judicial relief" by filing a lawsuit, is an exercise of executive authority. *Id.* at 138. Further, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Against this legal framework, the undersigned finds that the Attorney General's decision whether to seek administrative or judicial remedies is an executive function, not a legislative one.[8] *Buckley*, 424 U.S. at 138 ("The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress."). While it is true that the CSA provides the Attorney General with the authority to seek criminal and civil monetary penalties and declaratory and injunctive relief in federal court, to the extent such penalties are sought, the Attorney General has no

---

[8] Citing to the Fifth Circuit's underlying opinion in *Jarkesy v. Securities and Exchange Commission,* 34 F.4th 446, 449 (5th Cir. 2022), Simfa also argues that "[a] scheme identical to DEA's was deemed a delegation of legislative power running afoul the nondelegation doctrine." (ECF No. 59 at 19). This argument fails for several reasons. First, the Supreme Court did not reach the nondelegation challenge in *Jarkesy.* 603 U.S. at 121 ("we do not reach the nondelegation or removal issues"). Second, the enforcement provision at issue in *Jarkesy* afforded the SEC discretion whether to seek civil monetary penalties in federal court or administratively. *Id.* at 119. Here, however, the CSA does not afford such broad discretion to the DEA Administrator.

discretion as to the forum—the CSA clearly states that federal court is the only option.  *See, e.g.*, 21 U.S.C. §§ 842(c)(1)(A) (as to civil penalties: "The district courts of the United States . . . shall have jurisdiction . . . to enforce this paragraph."), 843(d)(1) (as to criminal penalties: "any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years, a fine under title 18, or both"), 843(f)(1) ("[T]he Attorney General is authorized to commence a civil action for appropriate declaratory or injunctive relief relating to violations of this section, section 842 of this title, or 856 of this title.").  Thus, the remedy dictates the forum for adjudication so that Congress' delegation of authority is accompanied by an intelligible principle.  *See Gundy*, 588 U.S. at 146.  Indeed, courts have addressed various aspects of the Attorney General's delegated authority in the regulation of controlled substances and found it sufficiently limited so as to satisfy the requirements of the nondelegation doctrine.  *See, e.g.*, *United States v. Keller*, 142 F.4th 645, 657-58 (9th Cir. 2025) (finding Attorney General's promulgation of 21 C.F.R. § 1306.04 satisfied the intelligible principle test); *Touby v. United States*, 500 U.S. 160, 166-67 (1991) (finding no unconstitutional delegation of legislative authority in Attorney General's power to temporarily schedule controlled substances pursuant to the CSA); *United States v. Gordon*, 580 F.2d 827, 839-40 (5th Cir. 1978) (concluding that delegation of authority to schedule drugs was constitutionally permissible); *United States v. Kelly*, 874 F.3d 1037, 1047-48 (9th Cir. 2017) (same).

Nonetheless, relying on *Gonzales v. Oregon*, 546 U.S. 243 (2006), Simfa argues that the "red flags" identified by DEA in the OSC/ISO constitute impermissible rulemaking by DEA in violation of the nondelegation doctrine, regarding, for example: (i) the "payment and prices DEA unilaterally deems acceptable;" (ii) the "distance patients may travel to obtain medical care;" and (iii) the practice of medicine, the methods of treatment, and the permissible bounds of practitioners' businesses, which it then enforces.  (ECF No. 59 at 18).  The undersigned disagrees.

First, the Court in *Gonzales* found that the CSA is "specific as to the manner in which the [DEA] must exercise this authority." 546 U.S. at 260. To the extent Simfa contends DEA's application of "red flags" somehow exceeds its authority, *Gonzales* offers no support, as DEA's red flag policy was not at issue in the case. Second, "the concept of red flags has long been recognized as a reflection of the norms of the pharmacy profession."[9] *Jones Total Health Care Pharmacy*, 881 F.3d at 828. Simfa's attempt to convert the "red flags" identified in the OSC/ISO into impermissible DEA rulemaking misstates the purpose of the administrative red flags and is unsupported by case law. Rather, DEA's "red flags" are relevant to whether a pharmacy filled a prescription with knowledge that the prescription may have been invalid. *See e.g., United States v. Howen*, No. 21-CV-00106-DADSAB, 2022 WL 18420744, at *8 (E.D. Cal. Aug. 9, 2022) (rejecting pharmacy's argument in its motion to dismiss that the government's reliance on red flags in pursuing civil penalties under 21 C.F.R. § 1306.04(a) amounted to interpretive rulemaking); *see also Pharmacy*, 2022 WL 444357, at *6 (citations and quotations omitted) ("[T]he Administration has long interpreted 21 C.F.R. section 1306.04(a) as prohibiting a pharmacist from filling a prescription for a controlled substance when he either knows *or has reason to know* that the prescription was not written for a legitimate medical purpose."); *cf. United States v. Iriele*,

---

[9] Indeed, other district courts have concluded there is "no question" that CSA registrants are required "to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances." *In re Nat'l Prescription Opiate Litig.,* 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), *clarified on denial of reconsideration*, No. 17-MD-2804, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020). Moreover, DEA has articulated the specific elements of a prima facie violation of a registrant's responsibility under 21 C.F.R. § 1306.04(a): "to show a violation of a corresponding responsibility, the Government must establish that: (1) the Respondent [a pharmacy] dispensed a controlled substance; (2) a *red flag* was or should have been recognized at or before the time the controlled substance was dispensed; and (3) the question created by *the red flag* was not resolved conclusively prior to the dispensing of the controlled substance." *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d at 629 (quoting *Holiday CVS, L.L.C.*, 77 Fed. Reg. 62316-01, 62341 (2012)).

977 F.3d 1155, 1170-71 (11th Cir. 2020) (accepting red flags to establish pharmacist's knowledge that prescriptions were illegitimate in affirming criminal conviction).  Finally, to the extent Simfa seeks to challenge the legitimacy of the "red flags" articulated and as-applied to the OSC/ISO, such challenges are reviewable by the Eleventh Circuit following the Administrator's final decision in the underlying administrative hearing.  21 U.S.C. § 877.

In addition, DEA registrants may only fill prescriptions "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a); *see* 21 C.F.R. § 1306.06 ("A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice . . . .").  The prescribing doctor and the pharmacist who fills the prescription share a "corresponding responsibility" under the regulations.  21 C.F.R. § 1306.04(a).  DEA has interpreted this "corresponding responsibility" to include "assess[ing] prescriptions according to the applicable standard of practice, which typically requires the pharmacist to recognize and resolve red flags on the prescriptions prior to filling them, and to act on that assessment by filling or declining to fill the prescription." *Heartland Pharmacy*, 2021 WL 650350, at *4 (quoting *Suntree Pharmacy and Suntree Medical Equipment, LLC*, 85 Fed. Reg. 73,753-01, 73,774 (2020)); *see also* Fla. Admin. Code. r. 64B16-27.810(1) (Florida regulation requiring that pharmacists review patient records and each new prescription for: (i) over-utilization or under-utilization; (ii) therapeutic duplication; (iii) drug-disease contraindications; (iv) drug-drug interactions; (v) incorrect drug dosage or duration of drug treatment; (vi) drug-allergy interactions; and (vii) clinical abuse/misuse). Moreover, "Florida pharmacists violate both Florida law and federal law, specifically 21 C.F.R. § 1306.04(a), when 'they fail to identify and resolve the red flags that are part of the prospective drug use review set forth in Rule 64B16-27.810' and subsequently 'knowingly fill

prescriptions without resolving these red flags during this review.'"   *Heartland Pharmacy*, 2021 WL 650350, at *4 (quoting *Trinity Pharmacy II*, 83 Fed. Reg. 7,304, 7,329 (2018)).

Thus, contrary to Simfa's allegations, the OSC/ISO did not improperly promulgate new rules regulating the practice of medicine by noting "red flags" of diversion/abuse of controlled substances. *See id*. at *3-5 (discussing overall structure of DEA administrative proceedings, the relevant DEA statutory and regulatory framework, applicable state and federal laws, and "red flags" of diversion in rejecting plaintiff's argument that DEA lacked authority to issue an immediate suspension of plaintiff's ability to dispense controlled substances);[10] *see also* 21 U.S.C. § 824(d) (defining "imminent danger to the public health or safety" as the potential for death, serious bodily harm, or abuse of controlled substances "due to the failure of the registrant to maintain effective controls against diversion or otherwise comply with the obligations of a registrant under this subchapter or subchapter II").   Accordingly, the undersigned recommends that Count 5 be dismissed.

### B.    Simfa's Cross-Motion for Summary Judgment (as to Counts 1 and 2)

Rather than respond to Defendants' Motion to Dismiss Counts 1 and 2, Simfa filed a Cross-Motion for Summary Judgment.  (ECF Nos. 62, 62-1).  In its motion, Simfa generally argues that a DEA registration to dispense controlled substances is a private property right and that revocation of that property right and seizure of Simfa's inventory is analogous to a suit at common law (i.e.,

---

[10] Although *Heartland Pharmacy* was in a different procedural posture (dealing with a plaintiff's motion for temporary restraining order/preliminary injunction, not a defendant's motion to dismiss), the case is factually analogous to the instant case in that it involved: (i) a DEA Order to Show Cause and Immediate Suspension Order that raised almost verbatim "red flags;" (ii) the testimony of the same DEA expert witness (Dr. Thomas Hamilton) that Simfa challenges; and (iii) the same ALJ (Theresa Wallbaum) as here.  *Heartland Pharmacy*, 2021 WL 650350, at *1-2. Not surprisingly, the District Judge noted no irregularities with DEA's use of red flags, its expert, or the assigned ALJ.

professional negligence and statutory forfeiture), which requires a trial by jury in an Article III court. *See generally id.*

Count 1 incorporates by reference the allegations in Paragraphs 1 through 93 of the SAC. (SAC ¶ 94). In relevant part, Count 1 alleges that:

> 52. Registrants have no right to a jury trial in DEA administrative sanctions proceedings within the Agency.
> * * *
> 67. The [OSC/ISO] found based on Hamilton's opinion that [Simfa] dispensed prescriptions alluded to therein in violation of binding "minimum practice standards governing pharmacy practice in Florida." Exhibit B at 3 & 9. DEA will attempt to prove this at the administrative hearing through Hamilton's testimony and has designated Hamilton as an expert in the standard of care for pharmacy practice in Florida who will opine that [Simfa] breached the standard of care for the professional practice of pharmacy in Florida as espoused by Hamilton.
> * * *
> 90. The CSA's scheme and how it is actually used by the executive branch therefore undermine any notion that DEA registrations involve "public rights"; registration sanctions actions historically were decided by the executive or legislative branches alone outside of Article III courts; that DEA is integral to the statutory enforcement scheme and the Seventh Amendment right to jury trial; or that DEA is uniquely suited to adjudicate sanctions actions such as revocation and suspension instead of Article III courts.
>
> 91. Thus, the Government cannot rely on the so-called public rights exception to defeat Plaintiff's Seventh Amendment right to a jury trial or the bar on agency adjudication of DEA's sanctions action imposed by Article III in this case.
> * * *
> 96. DEA's revocation action is a "suit at common law" within the meaning of the Seventh Amendment because it is a statutory forfeiture action no different than those that were decided in common law courts with the aid of juries in England in the 12th century and in America at least as far back as 1630 and continuing up through 1791 and the present.
>
> 97. The Government deprives registrants of rights to their registrations, professional licenses, and other property in Article III courts pursuant to the enforcement provisions of the CSA – including 21 U.S.C. §§ 843(f) and 882(a) which authorize the Attorney General to seek broad declaratory and injunctive relief for any violation of the CSA.
> * * *
> 100. DEA's revocation action in this case is a "suit at common law" within the meaning of the Seventh Amendment because the nature of the issues to be tried – which are the focus of the Court's analysis – are identical to those in professional

39

negligence actions and other traditional common law tort causes of action: duty and breach. *De Fernandez v. Seaboard Marine, Ltd.,* No. 20-CV-25176, 2022 WL 2237186 at *1, *5 (S.D. Fla. June 22, 2022) *quoting Chauffeurs, Teamsters, & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 569 (1990) ("[t]he Seventh Amendment question depends on the nature of the *issue* to be tried rather than the character of the overall action") (emphasis in original); *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.,* No. 19-cv-23591, 20 22 WL 499710 at *1, *2-*4 (S.D. Fla. Feb. 18, 2022) (holding that novel statutory action was a suit at common law under the Seventh Amendment because the issues to be tried involve questions of duty and breach, the elements of a traditional common law negligence cause of action).

101. The professional standard of care or scope of the legal duty owed by a medical professional or healthcare provider to a patient in a particular situation and what is required to meet the standard of care and how the professional deviated from it (the breach or negligence element) are questions of fact for the jury in professional negligence actions under the common law.  Generally, those claims can only be established through expert testimony as DEA attempts to do here with Hamilton. Fla. Stat. § 766.102; *Law v. Carnival Corp.*, No. 20-21105-civ-TORRES, 2021 WL 3129631 at *1, *2-*4 (S.D. Fla. July 23, 2021); *Torres v. Sullivan*, 903 So.2d 1064, 1067-68 (Fla. App. Ct. 2d Dist. 2008).

102. DEA, the Administrator, and ALJ Wallbaum have no special knowledge, expertise, training or experience in the practice of pharmacy generally or in Florida or the pharmacist's standard of care owed with respect to any of the prescriptions referenced in the [OSC/ISO].

103. DEA, the Administrator, and ALJ Wallbaum are not uniquely suited to adjudicate DEA's sanction action [against] [Simfa].

104. DEA's revocation action is a suit at common law (statutory forfeiture and professional negligence) resting on the requisite standard of care and the value in controversy exceeds twenty dollars.

105. In its Agency proceeding, DEA seeks to punish [Simfa] and deter others for alleged violations of the CSA, including alleged criminal conduct in violation of 21 U.S.C. § 829, by permanently depriving it of the protected property and liberty interests in its registration and having [Simfa]'s tangible private personal property, i.e., the controlled substances DEA seized pursuant to the [OSC/ISO], forfeited to the Government by the final revocation order pursuant to the CSA.

106. These are common law causes of actions and legal remedies that have traditionally been brought in common law courts and decided by juries in England and America long before the founding or the ratification of the Constitution and Bill of Rights.

107. No restitution or compensation is sought by DEA in its action against [Simfa]. The DEA's action against [Simfa] does not seek any equitable remedy or relief that is equitable in nature such as to restore the status quo.

108. The property DEA seeks to declare forfeited to the United States through its administrative revocation order automatically vests to the United States when it becomes final and the Defendants do not share it or the proceeds of any sale thereof with any victim or use proceeds to redress any harm to the public at large.

109. DEA's in-house administrative revocation action against [Simfa] therefore violates [Simfa]'s Seventh Amendment right to a jury trial.

(SAC ¶¶ 52, 67, 90-91, 96-97, 100-09).

Count 2 also incorporates by reference the allegations in Paragraphs 1 through 93 of the SAC. (SAC ¶ 110). In relevant part, Count 2 further alleges:

24. [Simfa]'s registration and the rights conferred thereby vest upon issuance in [Simfa] only and cannot be assigned or otherwise transferred without the written consent of the Attorney General. Exhibit A; 21 U.S.C. § 822(a)(2)(C).
* * *
35. Thus, Agency adjudication of an order to show cause and immediate suspension order results in the forfeiture of the registrant's private property to the United States without compensation and outside of Article III court and without a jury.
* * *
38. It is easier and more convenient for the Defendants to forfeit registrants' private property to the Government by bringing an administrative sanctions proceeding against the registrant within the Agency instead of bringing an enforcement action in Article III court.
* * *
40. If the Administrator elects to terminate a registration through an administrative revocation action, the Administrator adjudicates the action for the Agency without any involvement of an Article III court or a jury and without any meaningful involvement of a neutral, impartial, independent, and fair adjudicator.
* * *
47. ALJ Wallbaum is not an Article III judge.

48. The Administrator is not an Article III judge.

49. The DEA's in-house proceeding is not an Article III court.
* * *
51. The registrant facing the loss of his property rights and often career-ending sanction of revocation in a sanctions proceeding brought within the Agency has none of the protections afforded when the Government litigates against citizens in Article III courts. Registrants have no right to any discovery, are given very basic

information about the Government's claims, and only a summary of the testimony against it and the DEA's hearing exhibits shortly before the hearing.  The Federal Rules of Civil Procedure and Rules of Evidence do not apply.  A neutral, independent Article III judge is not involved in the process and there is no right to a jury trial in enforcement proceedings brought within the Agency.

\* \* \*

84. DEA acknowledges that [Simfa] "has a constitutionally protected property interest in [its] DEA registration."  *Barry M. Schultz,* M.D. 76 Fed. Reg. 78,695 (Dec. 19, 2011).  *See also, Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (a claimant has a right to due process where ''the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation.'')

\* \* \*

86. In the CSA, Congress did not assign sole jurisdiction over registration sanctions actions, the rights of a registrant to an existing, vested registration, the registrants' rights to perform the activities authorized by the registration or any other matter to the Attorney General, to DEA or any other executive branch official or administrative agency for exclusive adjudication by them outside of Article III.

87. Congress assigned these matters to Article III courts as well and expressly provided the right to jury trial in registration sanctions actions and enforcement actions brought in Article III courts.  21 U.S.C. §§ 882; 843(f).

88. The Government also does not bring registration sanctions actions or enforcement proceedings exclusively before DEA for adjudication by it in-house or only seeks sanctions against registrants through administrative agency adjudications outside of Article III.

89. Rather, the Government imposes registration sanctions for CSA violations in Article III courts.

\* \* \*

111. DEA, the Administrator, and ALJ Wallbaum exercise the judicial power of the United States in adjudicating revocation cases that DEA herds through its in-house enforcement proceedings in violation of Article III of the United States Constitution.

112. DEA's adjudication of its revocation action against [Simfa] involves matters of private rights. The Agency and its ALJ wield judicial power to deprive [Simfa] of vested private rights interests in its registration and the authority thereunder critical to [Simfa]'s performance of a lawful trade and profession, determine ownership of tangible personal property seized by DEA without notice, and declare this property and [Simfa]'s registration certificate forfeited to the United States. This exercise of core judicial power by an executive agency as the judge in its own enforcement case violates due process and Article III.

113. This matter cannot be assigned to adjudication outside of an Article III court and without a jury.

114. Congress did not grant the Attorney General or the DEA exclusive authority to adjudicate any matters, including a registrant's rights to an issued registration or its right or authority to act under it.

115. Congress granted the Attorney General (and in turn his subdelegee the DEA Administrator) broad authority to take away the rights of a registrant under a registration by bringing civil and criminal proceedings in an Article III court and expressly provided defendants with the right to a jury trial in civil actions for injunctive and declaratory relief that is functionally equivalent to that which DEA seeks to award itself in its administrative action against [Simfa].

(SAC ¶¶ 24, 35, 38, 40, 47-49, 51, 84, 86-89, 111-15).

Article III of the Constitution establishes the judiciary system. U.S. Const. art. III. Relatedly, the Seventh Amendment to the Constitution provides that, "[i]n suits at common law, where the value in controversy . . . exceed[s] twenty dollars, the right of trial by jury shall be preserved." U.S. Const. Amend. VII. "Suits at common law" refer to suits where legal rights (not equitable rights and remedies) are ascertained and determined. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (citing *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 447 (1830)). Although the thrust of the Seventh Amendment was to preserve the right to jury trial as it existed in 1791, it has been expanded to actions enforcing statutory rights analogous to common law causes of action that were ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty. *Id.* at 41-42 (citing *Curtis v. Loether*, 415 U.S. 189, 193 (1974)).

### 1. *Nature of the Revocation Proceeding and Remedy Sought*

To determine whether the Seventh Amendment right to jury trial attaches to a statutory action, the Court must examine the nature of the action and the remedy sought. *Id.* at 42 (citing *Tull v. United States*, 481 U.S. 412, 417-18 (1987)). The second part of the analysis (i.e., the

remedy sought) is the more important factor.  *Id.* (citing *Tull*, 481 U.S. at 421).  "If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, [the Court] must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder."  *Id.*

Simfa argues that DEA's revocation proceeding is legal in nature, so that the right to trial by jury attaches, because: (i) it is identical to a common law cause of action for professional negligence (ECF No. 62-1 at 11-13); and (ii) revocation of Simfa's COR and forfeiture of its drug inventory is no different than statutory forfeiture actions enforced at common law.  *Id.* at 7-11.  Relying on *Jarkesy*, Simfa argues that "[a]n action to revoke a registration certificate and to forfeit title to Plaintiff's drugs to the United States and statutory forfeiture actions that existed in 1791 both target the same basic conduct: the failure to comply with the duties and obligations imposed by statute."  (ECF No. 62-1 at 9-10) (citing *Jarkesy*, 603 U.S. at 125).  But Simfa's reliance on *Jarkesy* is misplaced.

In *Jarkesy*, the Supreme Court addressed the narrow question of whether the SEC's authority to assess civil monetary penalties in its administrative proceedings violated the Seventh Amendment.  *Jarkesy*, 603 U.S. at 115.  Applying the two-part test from *Granfinanciera*, the *Jarkesy* Court first found that "[t]he SEC's antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a jury."  *Id*. at 120.  The Court noted that the SEC's fraud provisions "target the same basic conduct as common law fraud, employ the same terms of art, and operate pursuant to similar legal principles," and thus, these actions involve a matter of private right that Congress could not withdraw "from judicial cognizance."  *Id.* at 134 (citations and quotations omitted).  As to the second, more important factor, the Court concluded that the remedy sought by the SEC in its administrative proceeding (i.e., civil monetary

penalties) was "all but dispositive," as "money damages are the prototypical common law remedy." *Id.* at 123. Thus, the Court held that the SEC enforcement action implicated the Seventh Amendment right to trial by jury. *Id.* at 125.

Having considered Simfa's arguments and relevant case law, the undersigned concludes that *Jarkesy* is distinguishable from and inapplicable to the facts of this case. First, unlike in *Jarkesy*, the proceeding here is equitable and not legal in nature, as it looks to revoke Simfa's ability to distribute controlled substances *in the future.* Prospective relief is injunctive in nature. *See Alonso v. Alonso*, No. 18-CV-23668, 2019 WL 3337233 (S.D. Fla. July 25, 2019) ("In contrast to damages, injunctions are forward-looking remedies."); *Hollywood Mobile Ests. Ltd. v. Cypress*, 415 F. App'x 207, 209-10 (11th Cir. 2011) (finding requested injunction aimed at restoring plaintiff's right to occupy land was prospective equitable relief). Second, unlike *Jarkesy*, DEA is not seeking monetary penalties. Third, despite Simfa's creative analogies to professional malpractice and statutory forfeiture actions, DEA's revocation proceeding does not sound in common law. The CSA has no analogous common law counterpart targeting similar conduct, as the government's regulation of narcotics was simply not part of the common law decided in English law courts. *See Granfinanciera*, 492 U.S. at 42. Nor is DEA seeking statutory forfeiture.[11] Simply put, upon suspension of its COR, Simfa no longer had a legal ability to possess controlled substances under the CSA.[12] *See* 21 U.S.C. § 823; *see also* 21 C.F.R. § 1301.11(a). Furthermore, Simfa's entitlement to possess the controlled substances in the first place flows directly, and exclusively, from the CSA. Lastly, Simfa's unsupported arguments characterizing the suspension

---

[11] Notably, if DEA were seeking forfeiture, it must proceed in federal court pursuant to the CSA. 21 U.S.C. § 881.

[12] Indeed, possession of such controlled substances without a registration could constitute a criminal violation under the CSA.

and resulting seizure of controlled substances as a "sanction" or "punishment" do not change the Court's analysis that the remedy sought—future revocation of the COR—is equitable in nature.

### 2. *The Public Rights Exception*

Alternatively, assuming that DEA's revocation proceeding is deemed to be legal in nature, the "public rights" exception to the Seventh Amendment would nonetheless permit adjudication of this action in a non-Article III tribunal. *See Granfinanciera*, 492 U.S. at 53-54. When Congress creates new statutory "public rights," "it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 455 (1977). There is no right to jury trial where "public rights" are being litigated. *See id*.; *Granfinanciera*, 492 U.S. at 51, 53.

Actions involving "public rights" include those "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights," and private tort, contract, and property rights are not implicated. *Atlas Roofing*, 430 U.S. at 458; *see Crowell v. Benson*, 285 U.S. 22, 50 (1932) (distinguishing "cases of private right [from] those which arise between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments"). "In certain situations, . . . Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable." *Granfinanciera*, 492 U.S. at 52. Examples of administrative agencies created for the determination of public rights "are found in connection with the exercise of the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, public health, the facilities of the post office, pensions, and payments to veterans." *Crowell*,

285 U.S. at 51.  Based on the substance of the SEC's fraud actions (i.e., the strong similarity to traditional common law fraud), the Supreme Court explained why the "public rights" exception did not apply in *Jarkesy*.  603 U.S. at 127-40.

Against this legal backdrop, the undersigned alternatively concludes that this case presents a traditional "public rights" action "between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell*, 285 U.S. at 50.  Additionally, the public right at issue (i.e., the COR) falls squarely within regulation of the public health, an area that the Supreme Court recognizes as involving public rights. *Id.* at 51.  Registrations to dispense controlled substances under the CSA, like the COR, concern a public right that Congress has intentionally assigned to DEA for adjudication.  Moreover, DEA's rules and procedures "serve[] a public purpose as an integral part of a program safeguarding the public health," and Congress "has the power to condition issuance of registrations or licenses on compliance with agency procedures." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 589 (1985) (rejecting Article III challenge to a federal pesticide registration scheme).  Finally, unlike property interests created by common law or state law, Simfa's possession of the COR rests exclusively on "federal law," which also "supplies the rule of decision." *Id.* at 585.  Where, as here, Congress creates a "complex regulatory scheme," it can authorize an agency to oversee the "issuance of registration or licenses" to "voluntary participants in the program without providing for an Article III adjudication." *Id.* at 589.  Thus, Congress may create "a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.* at 594; *see also States Energy Servs., LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 335, 338 (2018) (citations omitted) (finding the grant of a patent is a matter involving

public rights and rejecting an Article III challenge because "a patent can confer only the rights that the statute prescribes," including subjecting a patent holder to the administrative system of review).

Accordingly, the undersigned recommends that Simfa's Cross-Motion for Summary Judgment be denied and Defendants' Motion to Dismiss be granted as to Counts 1 and 2.

## IV.    **RECOMMENDATION**

For the reasons discussed above, the undersigned respectfully **RECOMMENDS** that Defendants' Motion to Dismiss Amended Complaint (ECF No. 55) be **GRANTED** and Plaintiff's Cross-Motion for Summary Judgment (ECF No. 62) be **DENIED**.

**Within seven days** after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations. *See* Mag. J. R. 4(b) (any party may object to a Magistrate Judge's recommendation regarding dispositive motions within 14 days or within such other time as may be allowed by the Court). Further, **within seven days**, any party may respond to a parties' objections. *Id.* Failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R.  3-1 (2024); *see Thomas v. Arn*, 474 U.S. 140 (1985).

Lastly, if the parties do not intend to file objections, they shall file a Notice of Non-Objection **within three days** of this Report and Recommendation.

**DONE AND ORDERED** at Chambers in Fort Lauderdale, Florida on August 25, 2025.

ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc: U.S. District Judge David S. Liebowitz
    All Counsel of Record